FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

2014 AUG 13  A 8: 52

C~~ ~~~~~~ ~~~~~~~~~ ~~~~~RT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| ARMIYA BANI LAGASAN, | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-01035 (AJT / TCB) |
| HADBAN AL-GHASEL and JIMLA AL-GHASEL, | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiff Armiya Bani Lagasan ("Ms. Lagasan"), by and through her undersigned counsel, hereby files this Complaint against Hadban Al-Ghasel ("Mr. Al-Ghasel") and Jimla Al-Ghasel ("Mrs. Al-Ghasel") (collectively, "Defendants"), and in support thereof, alleges as follows:

### I.    INTRODUCTION

1.    Ms. Lagasan is a twenty-seven-year-old Filipino woman who was trafficked by Defendants through Qatar into the United States to serve as a domestic worker.

2.    For more than a year, Defendants subjected Ms. Lagasan to abominable working and living conditions.  Defendants required Ms. Lagasan to work at least 18 hours per day, seven days a week, for as little as $200 per month—or approximately *$0.40 per hour*.  Defendants prevented Ms. Lagasan from leaving their apartment by herself, confiscated her passport and travel documents, and prohibited her from communicating with anyone outside their presence. Throughout her employment with Defendants, Ms. Lagasan was denied medical care, even when she fell seriously ill with a fever, and even when she complained of severe tooth pain, which ultimately necessitated the pulling of seven teeth.  Defendants forced Ms. Lagasan to sleep on

the floor of a cramped closet in Defendants' children's room, and verbally abused Ms. Lagasan, threatening to reduce her pay if she took breaks from cooking and cleaning, and scolding her if they observed her attempting to speak to anyone outside their family.

3.      Under these circumstances, Ms. Lagasan—who is not a native English-speaker, and who knew no one in the United States aside from her traffickers—justifiably believed she had no alternative but to continue working for and living with Defendants.  Ms. Lagasan thus remained in Defendants' employ for more than a year, privately suffering, but unable to escape.

4.      Fortunately, a concerned neighbor who had observed Defendants' treatment of Ms. Lagasan while in Defendants' apartment contacted the National Human Trafficking Resource Center.

5.      Upon information and belief, the National Human Trafficking Resource Center contacted United States Immigration and Customs Enforcement ("ICE"), and alerted them to Ms. Lagasan's situation.

6.       On or about August 30, 2012, ICE agents came to Defendants' residence in Alexandria, Virginia and rescued Ms. Lagasan from Defendants.

7.      Since her rescue, Ms. Lagasan has been able to obtain a T-1 visa, and she is now employed at a restaurant, where she has been working for approximately one year.

8.      Upon information and belief, Defendants left the United States and returned to Qatar shortly after Ms. Lagasan was rescued from their apartment.

9.      Although Ms. Lagasan wants nothing more than to put her painful experience behind her, she cannot do so until Defendants have been forced to account for their conduct.

10.      Ms. Lagasan therefore brings this lawsuit to hold Defendants liable for their violations of the Fair Labor Standards Act ("FLSA"), the Victims of Trafficking and Violence

Protection Act ("TVPA"), and Virginia law, and to recover unpaid wages and interest thereon, as well as compensatory damages, punitive damages, and such other relief as this Court deems just and proper.

## II.    NATURE OF THE CASE

11.    Ms. Lagasan is a victim of forced labor, involuntary servitude, and human trafficking, as defined by the TVPA, Pub. L. No. 106-386, 114 Stat. 1464.

12.    Traffickers coerce their victims into performing labor through a variety of means, including—like Defendants—through psychological abuse, threats, isolation, and confinement.

13.    According to the United States State Department's 2013 Trafficking in Persons Report ("Trafficking Report"), *available at* http://www.state.gov/j/tip/rls/tiprpt/2013/index.htm (last visited August 12, 2014), the Philippines is a relatively common so-called "source country" for men, women, and children subjected to forced labor:

> A significant number of Filipino men and women who migrate abroad for work are subsequently subjected to conditions of involuntary servitude.  Men, women, and children are subjected to conditions of forced labor in factories, at construction sites, on fishing vessels, on agricultural plantations, and in the shipping industry, as well as in domestic service and other service sector jobs in Asia and increasingly throughout the Middle East.

Likewise, Qatar is a common "destination country" for women subjected to forced labor who, the State Department has found, are "particularly vulnerable" as a result of "their isolation in private residences and lack of protection under Qatari labor laws."  *See id.*

14.    In April 2013, the *New York Times* reported on the problem of indentured servitude, particularly in Qatar, where many foreign workers—like Ms. Lagasan—are brought into the country through personnel agencies that charge high fees, only to be paid wages that are far less than what they were originally promised.  Richard Morin, *Indentured Servitude in the Persian Gulf*, N.Y. TIMES, Apr.13, 2013, *available at* http://www.nytimes.com/2013/04/14/

sunday-review/indentured-servitude-in-the-persian-gulf.html?pagewanted=1&_r=0 (last visited August 12, 2014).

### III. JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises in part under the TVPA, 18 U.S.C. §§ 1581-1597, and the FLSA, 29 U.S.C. §§ 201-219a.

16.     This Court has supplemental subject matter jurisdiction over Ms. Lagasan's state-law claims pursuant to 28 U.S.C. § 1367.

17.     Defendants are subject to personal jurisdiction in this District because Defendants have purposefully availed themselves of the privilege of conducting activities in this District and Ms. Lagasan's claims arise out of those activities.

18.     As Defendants currently reside in a foreign country, the requisite service to establish this Court's personal jurisdiction over Defendants may be accomplished by any "means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f)(3).

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

### IV. THE PARTIES

20.     Armiya Bani Lagasan ("Ms. Lagasan") is a citizen of the Philippines who currently resides in Washington, D.C.

21.     From approximately February 2011 through September 2011, Ms. Lagasan resided in Defendants' home in Pittsburgh, Pennsylvania with Defendants and their two children.

22.     From approximately September 2011 through August 2012, Ms. Lagasan resided in Defendants' home in Alexandria, Virginia with Defendants and their two children.

23.     Upon information and belief, Defendant Hadban Al-Ghasel ("Mr. Al-Ghasel") is

4

a citizen of Qatar who currently resides in Qatar.

24.     Upon information and belief, Defendant Jimla Al-Ghasel ("Mrs. Al-Ghasel") is a

citizen of Qatar who currently resides in Qatar.

## V.     STATEMENT OF FACTS

### A.     Ms. Lagasan Agrees To Travel To Qatar To Work As A Domestic Servant In Order To Support Her Family

25.     Ms. Lagasan was born in Maguindanao, Philippines.

26.     Prior to traveling to Qatar to serve as a domestic worker, Ms. Lagasan resided in

Cotabato, Philippines, with her husband, daughter, parents, brother, and five sisters, in a small

one-room house on Ms. Lagasan's parents' farm.

27.     Although Ms. Lagasan was the valedictorian of her class in high school, she was

unable to afford a college education.

28.     Ms. Lagasan's family has suffered significant financial hardship over the years.

29.     As a result of severe flooding, harvest yields declined, and Ms. Lagasan's father

was forced to take out several mortgages on his land in order to be able to provide for his family.

30.     In or around 2010, the Lagasan family was faced with the risk of losing their farm

and their home if these mortgages were not repaid.

31.     Desperate to assist her family in meeting its financial obligations, and to begin

saving money for a home of her own, Ms. Lagasan sought employment in the Philippines, but

was unable to find a position that would enable her to support her family.

32.     In or around June 2010, Ms. Lagasan met a woman named Nuriya, who offered to

help Ms. Lagasan find work as a domestic servant overseas for an Arab family.

33.     Nuriya referred Ms. Lagasan to a recruiting agency in Manila, Philippines, known

as Golden Future.

34.     Nuriya was a recruiter for Golden Future, and she told Ms. Lagasan that others who sought work through Golden Future had received gifts from their employers, in addition to substantial salaries.

35.     Once Ms. Lagasan agreed to seek employment through Golden Future, Nuriya helped Ms. Lagasan obtain a passport, which was then sent to Golden Future in Manila.

36.     Pursuant to Ms. Lagasan's arrangement with Nuriya and Golden Future, Ms. Lagasan was not responsible for paying the fees associated with obtaining her passport or for her plane ticket abroad.  In return for Golden Future's payment of her passport fees and plane ticket, Ms. Lagasan agreed to pay Golden Future two months' salary, and to pay Nuriya an additional two months' salary as a "recruiting fee."

37.     In or around July or August 2010, Nuriya took Ms. Lagasan to Cotabato City to pick up Ms. Lagasan's passport.

38.     Nuriya immediately took possession of the passport and, upon information and belief, sent the passport to Golden Future in Manila.

39.     On or about August 27, 2010, Ms. Lagasan left her family in Cotabato and traveled to Manila to attend a three-week orientation program at Golden Future.

40.     During the orientation, Ms. Lagasan was housed in a single room of a small apartment with about forty other women, all of whom had been recruited to work overseas as domestic servants.

41.     Ms. Lagasan was given a three-day course in Arabic to prepare for her employment in the Middle East.  Prior to this three-day course, Ms. Lagasan spoke only her native language of Tagalog.

42.     Representatives from Golden Future informed Ms. Lagasan that even if she

decided not to undertake employment overseas, she still would be required to pay Nuriya and Golden Future an amount equivalent to four months' salary.

43.     While in Manila, Ms. Lagasan received paperwork from Golden Future, which showed that she would be working in Doha, Qatar, for Mr. Al-Ghasel.

44.     On or about September 23, 2010, a representative from Golden Future took Ms. Lagasan to the airport in Manila.

45.     At the airport, the Golden Future representative gave Ms. Lagasan her passport for the first time and a plane ticket to the United Arab Emirates, with a connecting flight to Doha, Qatar.

46.     The Golden Future representative also gave Ms. Lagasan a receipt signed by the Philippine Department of Labor and Employment, indicating that her salary in Qatar was to be $400 USD per month.

## B.     Defendants Traffic Ms. Lagasan Into The United States Through Qatar

47.     On or about September 24, 2010, Ms. Lagasan arrived in Doha, Qatar.

48.     Representatives from Gulf Spring Manpower, Golden Future's sister agency, picked Ms. Lagasan up from the airport in Doha.  These representatives took Ms. Lagasan's passport, and did not return it to her.

49.     Agency representatives also took Ms. Lagasan's cell phone, which was never returned to her.

50.     The agency representatives in Qatar told Ms. Lagasan that her salary would be 730 Qatari Riyals per month, or about $200 USD—half as much as the salary of $400 USD that had been listed on the receipt Ms. Lagasan received from the Philippines Department of Labor prior to her departure.

51.     While at the agency, Ms. Lagasan witnessed a scene involving another Filipina

woman who had been returned to the agency by her employer because she cried too much. The agency representatives screamed at the woman, went through all of her belongings, and took her money. Ms. Lagasan believed that the same thing would happen to her if her employer was not satisfied with her performance.

52.   On or about September 28, 2010, Mrs. Al-Ghasel's sister, Baniya, picked Ms. Lagasan up from the agency.

53.   Ms. Lagasan worked for Baniya for a week, after which Baniya took Ms. Lagasan to Umm Bab, a small desert town in western Qatar.

54.   Ms. Lagasan lived with and worked for Mrs. Al-Ghasel's mother in Umm Bab for a period of nearly four months.

55.   Ms. Lagasan's workdays in the desert were grueling. She was forced to work eighteen or nineteen hours per day, and did not have any days off.

56.   Ms. Lagasan was responsible for cleaning Mrs. Al-Ghasel's mother's tent, which had to be done constantly because of the sandstorms in the desert.

57.   Ms. Lagasan also cooked all of Mrs. Al-Ghasel's mother's meals, combed her hair, and cleaned and massaged her legs each night before she went to sleep.

58.   Ms. Lagasan's living conditions in Umm Bab were abhorrent. She was required to sleep outdoors on a mattress on the sand. Many mornings she woke up to see trails in the sand around her mattress, which had been left by snakes moving around her at night.

59.   Mrs. Al-Ghasel's mother spoke only Arabic to Ms. Lagasan, and Ms. Lagasan knew just the little Arabic that she had learned during her three-day course at Golden Future. Often, Ms. Lagasan did not understand what Mrs. Al-Ghasel's mother was saying.

60.   When other Al-Ghasel family members visited, Mrs. Al-Ghasel's mother would

not allow Ms. Lagasan to speak with their domestic servants, even though many of them were Filipina, and Ms. Lagasan wanted to speak to them.

61.     During the day, Ms. Lagasan was not allowed to sit down.  Mrs. Al-Ghasel's mother yelled at Ms. Lagasan if she saw her trying to take a break from her work, and Ms. Lagasan was afraid of her.

62.     On one occasion, in or around December 2010, Mrs. Al-Ghasel's mother grabbed Ms. Lagasan by her headscarf and shoved her into the goats' pen, locking her in the cage. During the incident, Mrs. Al-Ghasel's mother was waving a stick around angrily, and Ms. Lagasan was afraid she was going to hit her.

63.     Ms. Lagasan was paid approximately 730 Qatari Riyals per month (about $200 USD) during her time in Umm Bab.  Ms. Lagasan was not, however, paid for her work in October or November 2010; she was told that the agency was keeping that money.

64.     In or around December 2010, Ms. Lagasan was taken from Umm Bab to Doha, where she worked for Mrs. Al-Ghasel's sister, Baniya, until she left Qatar.

65.     In Doha, Ms. Lagasan performed domestic labor every day from about 4:00 a.m. until 11:00 p.m. or 12:00 a.m.

66.     In or around January 2011, Baniya informed Ms. Lagasan that she would be going to the United States to work for Mr. and Mrs. Al-Ghasel.

67.     Mr. Al-Ghasel's brother presented Ms. Lagasan with an employment agreement for her to sign.  A true and correct copy of this agreement is attached hereto as Exhibit A.

68.     The employment agreement identifies Mr. Al-Ghasel as Ms. Lagasan's employer.

69.     Under the terms of her employment agreement, Ms. Lagasan was guaranteed "the prevailing wages of Pennsylvania per hour."  The employment agreement further specified that

9

Ms. Lagasan's working hours would be limited to eight hours per day and 40 hours per week, with two days off for weekends; that she would retain possession of her passport; and that she would not be required to remain with her employer on weekends and holidays.

70.     After showing her the employment agreement, Mr. Al-Ghasel's brother took Ms. Lagasan to the U.S. Embassy in Qatar.

71.     A consular officer at the U.S. Embassy asked Ms. Lagasan if she had read and understood the contract. Ms. Lagasan responded that she had. Mr. Al-Ghasel's brother produced Ms. Lagasan's passport and left it with the Embassy.

72.     On or about February 11, 2011, another sister of Mrs. Al-Ghasel's came to Baniya's house. This sister threatened Ms. Lagasan, telling her that when she arrived in the United States, she had better wait at the airport for Mr. Al-Ghasel "or else"—and then she made a throat-cutting motion with her finger. Ms. Lagasan understood this gesture to mean that she would be in a lot of trouble if she did not work for Mr. Al-Ghasel, or if she tried to escape.

73.     On or about February 12, 2011, a driver took Ms. Lagasan to the airport and walked her to security. There, he handed her a plane ticket and her passport, which she had not seen since her visit to the U.S. Embassy in Doha.

74.     At the time, Ms. Lagasan had only 20 Qatari Riyals—about $5 USD—in her possession. Ms. Lagasan had sent most of the money she had earned in Qatar to Golden Future and to her family in the Philippines.

**C.     Defendants Subject Ms. Lagasan To Involuntary Servitude**

**1.     Defendants Take Possession Of Ms. Lagasan's Passport Upon Her Arrival in the United States**

75.     On or about February 12, 2011, Ms. Lagasan entered the United States via Dulles International Airport and then flew to Harrisburg, Pennsylvania, where she was to meet Mr. Al-

Ghasel.

76.    When she first came to the United States, Ms. Lagasan spoke limited English.

77.    When Ms. Lagasan arrived in Harrisburg, it was a cold day and there was snow on the ground. Ms. Lagasan did not have a jacket with her, as she had come directly from Qatar, where the weather was warm. Ms. Lagasan waited outside the airport for an hour, but Mr. Al-Ghasel did not arrive, so she went back inside. She was hungry because she did not have enough money to buy food.

78.    Ms. Lagasan approached an American couple and asked if she could use their cell phone to call Mr. Al-Ghasel. The American couple introduced themselves as Eldon and Ginger. Eldon called Mr. Al-Ghasel using the phone number Ms. Lagasan provided. Mr. Al-Ghasel answered and informed Eldon that he would not be at the airport for another five hours.

79.    Eldon and Ginger took Ms. Lagasan back to their apartment to wait for Mr. Al-Ghasel. They prepared a meal for her and gave her a suitcase full of clothes and a winter jacket before taking her back to the airport to meet Mr. Al-Ghasel.

80.    Mr. Al-Ghasel arrived at the airport in Harrisburg at around midnight to pick up Ms. Lagasan. He drove Ms. Lagasan to his family's apartment in Pittsburgh, Pennsylvania, where he lived with his wife and their two young daughters in a three-bedroom apartment in an apartment community called Webster Hall.

81.    Shortly after her arrival, on or about February 13, 2011, Mrs. Al-Ghasel demanded Ms. Lagasan's passport and travel documents from her. Ms. Lagasan surrendered her plane ticket and passport to Defendants. Defendants held Ms. Lagasan's passport and did not return it to her during Ms. Lagasan's entire period of employment. Ms. Lagasan kept a copy of her employment contract, which she hid from Defendants.

82.     Mrs. Al-Ghasel reprimanded Ms. Lagasan for speaking to the American couple at the Harrisburg airport, and, with the exception of one jacket, did not allow Ms. Lagasan to keep any of the clothes that the couple had given her.

83.     From the time that Ms. Lagasan arrived at Defendants' apartment until April 2011, another Filipina domestic servant, Norsalyn Juaidi, was working for and living with the Al-Ghasels.

84.     Ms. Juaidi was very afraid of Defendants, which engendered fear of Defendants in Ms. Lagasan as well.

### 2.     Defendants Force Ms. Lagasan To Work More Than Eighteen Hours Per Day for Far Less Than the Federal Minimum Wage

85.     Ms. Lagasan lived with and worked for Defendants in Pittsburgh, Pennsylvania from approximately February 2011 until September 2011. Defendants paid Ms. Lagasan $201 per month for her services during this period. Ms. Lagasan sent two months' salary (approximately $400) to Nuriya, her recruiter, to pay her recruitment fee.

86.     On or about September 26, 2011, Ms. Lagasan moved with Defendants to Alexandria, Virginia. In Alexandria, Defendants increased Ms. Lagasan's salary to $220 per month. Ms. Lagasan received only one bonus during her employment—a $200 gift during Ramadan in 2012.

87.     Ms. Lagasan typically worked for Defendants from 5:00 a.m. until about 11:00 p.m. or 12:00 a.m., although she worked longer hours during Ramadan and when the Al-Ghasels had guests over for dinner.

88.     Ms. Lagasan's duties included cleaning the entire apartment, cooking for the Al-Ghasels and their guests, and laundering the Al-Ghasels' clothing. In Pittsburgh, Mrs. Al-Ghasel required Ms. Lagasan to launder the clothing by hand, and would not permit her to use the

washing machines that were located in the apartment community because Ms. Lagasan was not allowed to leave the apartment unsupervised. In Alexandria, Ms. Lagasan was permitted to use the washing machine, which was located inside Defendants' apartment.

89.     Ms. Lagasan was also responsible for caring for Defendants' children, assisting them with their homework and getting them ready for school.

90.     Two or three times per week, Mr. Al-Ghasel invited guests to the apartment for dinner. Generally, there were six or seven dinner guests, and Ms. Lagasan was required to prepare an entire meal for them. On these days, Ms. Lagasan worked until 1:00 a.m. or 2:00 a.m.

91.     During the month of Ramadan, Ms. Lagasan was required to prepare a large meal for the family before sunrise. To ensure that the meal was prepared on time, Ms. Lagasan had to begin cooking at 3:00 a.m. She would then continue working until midnight.

92.     When Defendants moved from Pittsburgh to Alexandria, they required Ms. Lagasan to pack and unpack all of the boxes containing the family's belongings, to put away all their clothes, and to arrange the furniture in every room. Defendants did not assist Ms. Lagasan with these tasks.

93.     Throughout her employment, Defendants never allowed Ms. Lagasan to take a single day off.

94.     Ms. Lagasan also was not permitted to take any breaks during her workday. Neither of the Defendants held jobs in the United States. Defendants were therefore present in the home much of the day.   If they saw Ms. Lagasan sitting down, even at night, they would assign her additional tasks. Defendants would yell at Ms. Lagasan to bring them food, to change the television channel, and to clean the same things over and over again.

95.     During Ms. Lagasan's first week in Pittsburgh, Mr. Al-Ghasel told her that if he

13

caught her sitting and not doing work, he would reduce her salary.

96.     Shortly after she arrived in Pittsburgh, Ms. Lagasan complained to Mrs. Al-Ghasel that Defendants were violating the terms of her employment contract by holding her passport and requiring her to work such long hours. Mrs. Al-Ghasel yelled at Ms. Lagasan and said that she did not care about the employment contract's terms.

### 3.     Defendants Subject Ms. Lagasan To Inhumane Living Conditions

97.     At Defendants' apartment in Pittsburgh, Ms. Lagasan slept in a small bedroom that Defendants used to store many of their belongings, including bicycles, a work desk, and the children's books and toys. Ms. Lagasan had no personal space. She kept her few personal belongings in her suitcase, which she never unpacked. Ms. Lagasan did not have a bed or a mattress. Instead, she slept on a blanket laid out on the floor. Ms. Juaidi, Defendants' prior domestic servant, also slept on blankets on the floor in the same room as Ms. Lagasan until she returned to the Philippines in April 2011.

98.     In Alexandria, Ms. Lagasan slept on the floor of a very small closet in the daughters' bedroom in Defendants' two-bedroom apartment. Because the closet was full of clothes, suitcases, and other belongings, Ms. Lagasan did not have space even to turn over when she slept. She had no mattress and slept on the floor with blankets. The closet had no ventilation and became very hot in the summer, making it difficult for Ms. Lagasan to sleep.

99.     Defendants did not permit Ms. Lagasan to engage in leisure activities. Mrs. Al-Ghasel expressly prohibited Ms. Lagasan from watching television.

100.    Defendants did not permit Ms. Lagasan to go to the mosque to attend religious services.

101.    Defendants also restricted Ms. Lagasan's attire. They did not allow her to wear makeup, and only permitted her to wear old pajama pants and T-shirts. Defendants required

Ms. Lagasan to wear a head scarf at all times, except for when she was sleeping or bathing. Mrs. Al-Ghasel scolded Ms. Lagasan when she attempted to wear other clothes.

### 4. Defendants Deny Ms. Lagasan Access To Essential Medical Services

102. In or around February 2011, Ms. Lagasan became ill. She had difficulty walking, had a bad headache and fever, and suffered from dizziness. She informed Defendants of her illness. Defendants, however, required Ms. Lagasan to work her normal hours and did not permit her to have any additional rest. They did not take her to the doctor or give her any medicine. Ms. Lagasan remained ill for about two weeks.

103. In or around March or April 2011, Ms. Lagasan spoke to her husband on the phone. Several times during their conversation, Ms. Lagasan used the Tagalog word for "hospital," which is "hospitale" and sounds similar to the English word. Mrs. Al-Ghasel overheard, and after the phone call ended she became very upset and started yelling at Ms. Lagasan. Mrs. Al-Ghasel told Ms. Lagasan that she would not be able to talk on the phone again if she talked about going to the hospital. From this exchange, Ms. Lagasan understood that she would never be permitted to go to the hospital.

104. In or around May 2011, Ms. Lagasan began experiencing severe tooth pain. Ms. Lagasan informed Defendants about her toothache. Again, Defendants did not permit her to go to bed early, and in fact, gave her additional chores to do.

105. Defendants also did not allow Ms. Lagasan to go to the dentist. Ms. Lagasan's tooth continued to bother her until she was rescued from Defendants in August 2012.

106. After her rescue, Ms. Lagasan was taken to the dentist, where she learned that she had a large cavity, and needed to have seven teeth pulled.

5.    **Defendants Prevent Ms. Lagasan From Speaking to Anyone Other Than Defendants and Restrict Her Movement**

107.    Defendants forced Ms. Lagasan to live in extreme isolation from the outside world. Ms. Lagasan was almost never permitted to leave the apartment complex where Defendants lived. She was not given a key to Defendants' apartment.

108.    On the rare occasion when Ms. Lagasan was permitted to leave the apartment complex, Mr. or Mrs. Al-Ghasel would accompany her, even when she was just going to Western Union to send money to her family in the Philippines.

109.    In Alexandria, Ms. Lagasan was permitted to take the children to their bus stop in front of the apartment complex, but had to return immediately.

110.    Defendants only infrequently permitted Ms. Lagasan to call her husband. On these occasions, Mr. Al-Ghasel would dial the telephone number on his cell phone; Ms. Lagasan was not allowed to dial the number herself. Ms. Lagasan did not have her own cell phone.

111.    Defendants also discouraged Ms. Lagasan from talking to neighbors in the apartment complex. For example, when Defendants hosted a Ramadan celebration at the apartment complex in Alexandria, Ms. Lagasan brought food to the guests but was not permitted to eat or socialize with anyone. In another instance, when Ms. Lagasan spoke to a person in the community lobby, Mrs. Al-Ghasel immediately questioned her regarding who she was talking to and what she was talking about.

112.    Eldon and Ginger, the American couple that Ms. Lagasan had met in the Harrisburg airport, tried to contact Ms. Lagasan by telephone and by letter, but Mrs. Al-Ghasel did not give Ms. Lagasan their letters and would not let them speak to Ms. Lagasan when they called.

113.    While working for Defendants, Ms. Lagasan became very depressed. She was

16

sad all the time and was unable to think clearly due to sleep deprivation caused by her long working hours. Ms. Lagasan cried every night. She felt like there was no escape from her situation.

114. Ms. Lagasan stayed with Defendants because she had nowhere to go and because she was terrified to leave. Defendants had seized her passport and travel documents. Without those documents, Ms. Lagasan was afraid that she could be arrested or deported at any time. Ms. Lagasan knew no one in the United States, spoke limited English, had little money, and, because of her confinement, was unfamiliar with the area surrounding the apartment. Ms. Lagasan told Defendants that she wished to return home to the Philippines, but they ignored her requests.

### 6.   Federal Agents Rescue Ms. Lagasan From Defendants

115. Although Mrs. Al-Ghasel continued to limit Ms. Lagasan's contact with people outside the home, Ms. Lagasan began to meet some neighbors while carrying out her daily duties for Defendants. After several encounters with a Moroccan woman at the school bus stop, Ms. Lagasan told the woman about her working conditions and asked for help. The woman refused to help Ms. Lagasan because the woman was afraid of Defendants.

116. In or around June or July 2012, a woman named Collette Price came to the apartment to tutor Defendants' daughters.

117. Ms. Price tutored the children approximately three times per week, for two hours at a time. While at the Defendants' home, Ms. Price observed Ms. Lagasan's poor working conditions and the manner in which Defendants treated Ms. Lagasan.

118. Concerned about Ms. Lagasan's well-being, Ms. Price actively sought opportunities to speak with Ms. Lagasan in private. Ms. Lagasan and Ms. Price were able to speak privately on a few occasions. Ms. Lagasan disclosed to Ms. Price that she could not leave Defendants' home because they had confiscated her passport and travel documentation.

119.   Mrs. Al-Ghasel would question Ms. Lagasan about her conversations with Ms. Price. When Mrs. Al-Ghasel learned that Ms. Price had come to the apartment when the Defendants were not home, she became angry and told Ms. Lagasan that she was not permitted to let anyone into the apartment when the Defendants were not home.

120.   In or around July 2012, Ms. Price contacted the National Human Trafficking Resource Center ("NHTRC")[1] to report Ms. Lagasan as a potential victim of human trafficking. With Ms. Price's permission, the NHTRC reported the information to ICE. ICE agents interviewed Ms. Price. Ms. Price also contacted the Alexandria Police Department.

121.   Ms. Price was afraid of Defendants, but continued to seek opportunities to speak with Ms. Lagasan so that she could learn more about Ms. Lagasan's situation and explain to her that she wanted to help her leave Defendants' home.

122.   On August 30, 2012, ICE agents went to Defendants' apartment to investigate Ms. Lagasan's living and working situation. ICE agents questioned Mr. Al-Ghasel, Mrs. Al-Ghasel, and Ms. Lagasan separately. When asked about Ms. Lagasan's passport, an ICE agent observed Mr. Al-Ghasel remove it from the pocket of a men's black leather jacket.

123.   After interviewing Defendants and Ms. Lagasan, the agents asked Ms. Lagasan if she wanted to leave Defendants' home. Ms. Lagasan confirmed that she did.

124.   After gathering her few belongings, Ms. Lagasan departed with the ICE agents.

125.   After she was rescued by ICE, Polaris Project provided Ms. Lagasan with emergency housing, food and clothing assistance, and medical and dental assistance.

126.   As a result of the trauma she experienced, Ms. Lagasan exhibited fear and anxiety, and often felt disoriented and had difficulty concentrating.

---

[1]   NHRTC is a toll-free hotline operated by Polaris Project, an anti-trafficking non-profit organization, which fields calls and texts from trafficking victims and individuals concerned about potential human trafficking situations.

127.    Ms. Lagasan has required extensive social services to reintegrate into society. Since her rescue, Ms. Lagasan has participated regularly in art journaling therapy groups, wellness classes, and meets regularly with a network of Filipino human trafficking survivors.

128.    Ms. Lagasan currently resides in the District of Columbia.

129.    On April 16, 2014, the Department of Homeland Security, U.S. Citizenship and Immigration Services approved her I-914 T-Nonimmigrant Visa application ("T-visa"). T-visas are available to victims of human trafficking who comply with requests from a law enforcement agency for assistance in the investigation or prosecution of human trafficking, and demonstrate that they would suffer extreme hardship if removed from the United States. *See* USCIS, Victims of Human Trafficking: T Nonimmigrant Status, *available at* http://www.uscis.gov/ humanitarian/victims-human-trafficking-other-crimes/victims-human-trafficking-t-nonimmigrant-status (last visited August 12, 2014).

130.    Ms. Lagasan's T-visa expires on April 14, 2018.

131.    Prior to approval of the T-visa application, Ms. Lagasan was lawfully present in the United States on Continued Presence status.

## VI.    CLAIMS FOR RELIEF

### COUNT I

### Forced Labor in Violation of the TVPA, 18 U.S.C. §§ 1589(a), 1595

132.    Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

133.    Under 18 U.S.C. § 1589(a), it is unlawful to "knowingly provid[e] or obtain[] the labor or services of a person . . . (1) by means of force, threats of force, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal

process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

134.    As alleged herein, Defendants knowingly provided or obtained Ms. Lagasan's labor and domestic worker services by threats of force, physical restraint, or threats of physical restraint to Ms. Lagasan; serious harm or threats of serious harm, including financial harm; abuse or threatened abuse of law or legal process; and/or a scheme, plan, or pattern intended to cause Ms. Lagasan to believe that if she did not perform the labor or services, she would suffer serious harm, including psychological, financial, or reputational harm, or physical restraint, in violation of the forced labor provision of the TVPA, 18 U.S.C. § 1589(a).

135.    Defendants knowingly provided or obtained Ms. Lagasan's labor by threats of force, physical restraint, or threats of physical restraint by procuring her travel to the United States from Qatar through threats of force, confining her to their residences in the United States, severely restricting her communication with the outside world, and reprimanding her whenever she did not follow their orders.

136.    Defendants knowingly provided or obtained Ms. Lagasan's labor by means of serious harm or threats of serious harm, including financial harm, by subjecting her to inhumane living conditions, denying her access to essential medical services, forcing her to work more than eighteen hours per day for approximately 40 cents per hour, and threatening to reduce or confiscate her pay if she did not follow their orders.

137.    Defendants knowingly provided or obtained Ms. Lagasan's labor by means of the abuse or threatened abused of law or legal process by confiscating her travel documents, including her passport.

138.    Defendants made Ms. Lagasan believe that if she left their residence or the employment, she would be subject to arrest and/or deportation.  Such threats constitute a scheme that caused Ms. Lagasan to believe that she had no option but to continue working for Defendants or suffer serious harm under 18 U.S.C. § 1589(a)(1) and (2).

139.    Defendants executed a scheme, plan, or pattern intended to cause Ms. Lagasan to believe that if she did not continue to work for Defendants, she would suffer serious harm by controlling her travel documents and her living conditions.  Such a scheme is prohibited by 18 U.S.C. § 1589(a)(1) and (2).

140.    Under 18 U.S.C. § 1589(b), it is unlawful to "knowingly benefit[], financially or by receiving anything of value, from participating in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any such means."  As alleged herein, Defendants knowingly benefited, financially or by receiving something of value, from participation in a venture that violated 18 U.S.C. § 1589(a), knowing or in reckless disregard of the fact that the venture was engaging in activity that violated § 1589(a).

141.    Defendants knowingly benefited financially or by receiving something of value, namely Ms. Lagasan's domestic worker services for minimal compensation, from participation in a venture that resulted in Ms. Lagasan's forced labor and involuntary servitude, knowing or in reckless disregard of the fact that their activity violated 18 U.S.C. § 1589(a), as alleged above.

142.    Ms. Lagasan brings this claim for relief pursuant to 18 U.S.C. § 1595.

143.    As a direct and proximate result of Defendants' actions, Ms. Lagasan has suffered damages in an amount to be established at trial.

144.    Ms. Lagasan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Lagasan as a proximate result of Defendants' conduct, and reasonable attorneys' fees incurred in this action.

## COUNT II

### Involuntary Servitude in Violation of the TVPA, 18 U.S.C. §§ 1584, 1595

145.    Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

146.    Under 18 U.S.C. § 1584(a), it is unlawful to "knowingly and willfully hold[] to involuntary servitude or sell[] into any condition of involuntary servitude, any other person for any term, or bring[] within the United States any person so held."

147.    "Involuntary servitude" includes "a condition of servitude induced by means of . . . any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or . . . the abuse or threatened abuse of the legal process." 22 U.S.C. § 7102(5).

148.    As alleged herein, Defendants knowingly and willfully subjected Ms. Lagasan to a condition of involuntary servitude for a period of almost five months in Qatar and over eighteen months in the United States in violation of 18 U.S.C. § 1584 that led her to believe she would suffer serious financial harm or physical restraint and potential physical abuse if she did not comply. Defendants also abused the legal process to imprison Ms. Lagasan, including by presenting fraudulently obtained documents to obtain her visa and confiscating her passport and travel documents and leading her to believe that she would be subject to arrest and/or deportation if she left.

22

149.    Defendants' threats and coercion caused Ms. Lagasan to reasonably believe that she had no alternative but to continue to work for Defendants.

150.    Ms. Lagasan brings this claim for relief pursuant to 18 U.S.C. § 1595.

151.    As a direct and proximate result of Defendants' actions, Ms. Lagasan has suffered damages in an amount to be established at trial.

152.    Ms. Lagasan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Lagasan as a proximate result of Defendants' conduct, and reasonable attorneys' fees incurred in this action.

## COUNT III

### Trafficking With Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the TVPA, 18 U.S.C. §§ 1590, 1595

153.    Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

154.    Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for [peonage, slavery, involuntary servitude, or forced labor]."

155.    As alleged herein, Defendants knowingly recruited, harbored, transported, provided and/or obtained Ms. Lagasan, bringing her first to Qatar then to the United States on fraudulent visas, for the purpose of involuntary servitude and forced labor in violation of the trafficking provision of the TVPA, 18 U.S.C. § 1590(a).

156.    As alleged herein, Defendants attempted to and did violate the prohibitions against involuntary servitude and forced labor set forth in 18 U.S.C. §§ 1584(a) and 1589(a) and (b).

23

157.    As a direct and proximate result of Defendants' actions, Ms. Lagasan has suffered damages in an amount to be established at trial.

158.    Ms. Lagasan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Lagasan as a proximate result of Defendants' conduct, and reasonable attorneys' fees incurred in this action.

## COUNT IV

**Unlawful Conduct With Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the TVPA, 18 U.S.C. §§ 1592, 1595**

159.    Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

160.    Under 18 U.S.C. § 1592(a), it is unlawful to "knowingly destroy[], conceal[], remove[], confiscate[], or possess[] any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person . . . in the course of a violation of . . . [or] with intent to violate [the provisions under the TVPA prohibiting trafficking, peonage, slavery, involuntary servitude, or forced labor]; or . . . to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons."

161.    Under 22 U.S.C. § 7102(8)(B), "severe forms of trafficking in persons" includes "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

162.    As alleged herein, Defendants knowingly concealed, removed, confiscated, or

possessed Ms. Lagasan's passport in the course of violating and with intent to violate 18 U.S.C. §§ 1584 and 1589, prohibiting involuntary servitude and forced labor.

163.   As alleged herein, Defendants attempted to and did violate the prohibitions against involuntary servitude and forced labor set forth in 18 U.S.C. §§ 1584 and 1589.

164.   As alleged herein, Defendants knowingly confiscated and possessed Ms. Lagasan's documents with the intention to prevent or restrict, or to attempt to prevent or restrict, Ms. Lagasan's ability to leave Defendants' residence in order to continue receiving her labor or services.

165.   As alleged herein, Ms. Lagasan, who was recruited, harbored, transported, provided, and obtained for labor or services through the use of threats of force, fraud or coercion, has been a victim of severe forms of trafficking as defined by 22 U.S.C. § 7102(8).

166.   Ms. Lagasan brings this claim for relief pursuant to 18 U.S.C. § 1595.

167.   As a direct and proximate result of Defendants' actions, Ms. Lagasan has suffered damages in an amount to be established at trial.

168.   Ms. Lagasan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Lagasan as a proximate result of Defendants' conduct, and reasonable attorneys' fees incurred in this action.

## COUNT V

### Benefitting Financially from Trafficking in Persons in Violation of the TVPA, 18 U.S.C. §§ 1593A, 1595

169.   Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

170.   18 U.S.C. § 1593A makes it unlawful to "knowingly benefit[], financially or by

receiving anything of value, from participation in a venture which has engaged in any activity in violation of section . . . 1592 or 1595(a), knowing or in reckless disregard of the fact that the venture has engaged in such violation" to the same extent "as a completed violation of such section."

171.    As alleged herein, Defendants knowingly benefited, financially or by receiving something of value, from participation in a venture that violated 18 U.S.C. § 1589(a), knowing or in reckless disregard of the fact that the venture was engaging in activity that violated § 1589(a).

172.    Defendants knowingly benefited financially or by receiving something of value, namely Ms. Lagasan's domestic services, from participation in a venture that engaged in activities in violation of 18 U.S.C. §§ 1592 or 1595(a) and either knew or was in reckless disregard of the fact that they violated such provisions.

173.    As alleged herein, Defendants attempted to and did violate the prohibitions against document servitude, forced labor, and involuntary servitude enforceable under 18 U.S.C. §§ 1592 and 1595(a).

174.    Ms. Lagasan brings this claim for relief pursuant to 18 U.S.C. § 1595.

175.    As a direct and proximate result of Defendants' actions, Ms. Lagasan has suffered damages in an amount to be established at trial.

176.    Ms. Lagasan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Lagasan as a proximate result of Defendants' conduct, and reasonable attorneys' fees incurred in this action.

## COUNT VI

### Conspiracy to Violate the TVPA, 18 U.S.C. §§ 1589, 1590, 1592, 1594, 1595

177.    Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every

allegation of the preceding paragraphs as though fully set forth herein.

178. 18 U.S.C. § 1594(b) makes it unlawful to "conspire[] with another to violate section . . . 1589, 1590, or 1592."

179. As alleged herein, all Defendants conspired to violate 18 U.S.C. § 1589, 1590, and 1592 by agreeing to obtain or provide Ms. Lagasan's services in violation of 18 U.S.C. § 1589, trafficking Ms. Lagasan in violation of 18 U.S.C. § 1590, and withholding documents from Ms. Lagasan in violation of 18 U.S.C. § 1592. Defendants came to an understanding to commit these violations through the course of their dealings with each other, as well as with Golden Future, Nuriya, Mr. Al-Ghasel's brother, Mrs. Al-Ghasel's sister Banaya, and Mrs. Al-Ghasel's mother.

180. Ms. Lagasan brings this claim for relief pursuant to 18 U.S.C. § 1895.

181. As a direct and proximate result of Defendants' actions, Ms. Lagasan has suffered damages in an amount to be established at trial.

182. Ms. Lagasan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Lagasan as a proximate result of Defendants' conduct, and reasonable attorneys' fees incurred in this action.

### COUNT VII

**Failure to Pay Federal Minimum Wage in Violation of the FLSA, 29 U.S.C. §§ 206, 216**

183. Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

184. At all relevant times, Defendants jointly acted as Ms. Lagasan's "employer" within the meaning of 29 U.S.C. § 203(d).

185. At all relevant times, Ms. Lagasan was an "employee" of Defendants within the

meaning of 29 U.S.C. § 203(d).

186.   At all relevant times, Ms. Lagasan was employed in domestic services in the Defendants' household within the meaning of 29 U.S.C. § 206(f).

187.   At all relevant times, Defendants failed and refused to pay Ms. Lagasan minimum wage for all hours worked, in accordance with § 206 of the FLSA.

188.   Defendants' failure to pay required compensation constitutes a willful violation of the FLSA within the meaning of 29 U.S.C § 255(a).  Defendants acted knowingly, willfully, or with reckless disregard that their conduct was prohibited, in failing to pay Ms. Lagasan the required wage, as further evidenced by Defendants submitting a fraudulent contract to obtain a visa for Ms. Lagasan to enter the United States.

189.   Ms. Lagasan brings this claim for relief pursuant to 29 U.S.C. § 216(b).

190.   As a direct and proximate result of Defendants' unlawful acts, Ms. Lagasan has been deprived of wages due to her, in an amount to be established at trial.

191.   As Ms. Lagasan's employer, Defendants are liable to Ms. Lagasan for her unpaid minimum wages, plus an equal additional amount as liquidated damages, reasonable attorneys' fees, costs of the action, and any other appropriate relief under the FLSA.

**COUNT VIII**

**Breach of Contract**

192.   Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

193.   Ms. Lagasan and Defendants entered into a valid, legally enforceable employment agreement.  This agreement was based on oral representations made by Defendants and Ms. Lagasan and a written employment contract, which memorialized key terms of the agreement.

194.   Ms. Lagasan and Defendants were required to execute a written contract in order

to obtain a visa enabling Ms. Lagasan to enter the United States to work as a domestic servant for Defendants.

195.    Under the employment agreement, Ms. Lagasan agreed to work for Defendants as a domestic servant, and in return, Defendants agreed to pay Ms. Lagasan "the prevailing wages of Pennsylvania per hour," and to provide Ms. Lagasan free room and board.

196.    Additionally, Defendants promised Ms. Lagasan that she would be permitted to take two days off per week; that she would retain possession of her passport; and that she would be allowed to move freely without restriction on weekends and holidays.

197.    Ms. Lagasan fully performed under the employment contract by working as a domestic servant in Defendants' home. Indeed, Ms. Lagasan's performance far exceeded that which was required under the agreement.

198.    Defendants breached the employment agreement by (1) failing to pay Ms. Lagasan the stated hourly wage; (2) requiring Ms. Lagasan to work more hours than permitted under the agreement; (3) refusing to provide Ms. Lagasan with any days off; and (4) confiscating Ms. Lagasan's passport and restricting her freedom of movement.

199.    Defendants' conduct was willful and wanton, and demonstrated a conscious disregard for Ms. Lagasan's rights.

200.    As a direct and proximate result of Defendants actions, Ms. Lagasan has suffered injury or damages, including economic losses and psychological harm.

201.    Ms. Lagasan is entitled to recover damages in an amount to be determined at trial, including punitive damages, attorneys' fees, and the costs of this action.

## COUNT IX

### Unjust Enrichment/Quantum Meruit

202.    Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every

allegation of the preceding paragraphs as though fully set forth herein.

203.    From approximately February 12, 2011, to August 30, 2012, Ms. Lagasan

conferred a benefit on Defendants by rendering services as a live-in domestic servant in good

faith and with the reasonable expectation that she would be fairly compensated for her services.

204.    Defendants requested and accepted the services that Ms. Lagasan performed, and

should have reasonably expected to pay Ms. Lagasan for these services.

205.    Defendants failed to compensate Ms. Lagasan for the fair market value of her

services.

206.    Defendants unjustly enriched themselves at Ms. Lagasan's expense and it would

be inequitable for Defendants to be permitted to retain such benefits without paying Ms. Lagasan

the value of the benefit she conferred upon them.

207.    Defendants' conduct was willful and wanton, and demonstrated a conscious

disregard for Ms. Lagasan's rights.

208.    As a direct and proximate result of Defendants' actions, Ms. Lagasan has suffered

economic losses.

209.    To the extent the employment agreement is found to be void, voidable, or

otherwise modified, and to avoid unjust enrichment, Ms. Lagasan is entitled to recover damages

in an amount to be proven at trial, including punitive damages, attorneys' fees and other relief

that the Court may deem proper.

## COUNT X

### Fraud

210.    Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every

allegation of the preceding paragraphs as though fully set forth herein.

211.    Defendants intentionally and knowingly made false representations of material

fact, with the intent to mislead Ms. Lagasan, who relied on the false representations and consequently suffered damages.

212.    Before Ms. Lagasan came to the United States to work in Defendants' home, Defendants made false representations of material fact to her, including, but not limited to, statements regarding her working conditions in the United States, such as the hours that she would be expected to work and the amount she would be paid.

213.    Mr. Al-Ghasel's brother, acting on behalf of Defendants, provided Ms. Lagasan with false information regarding Ms. Lagasan's wages, hours, and working conditions at the U.S. Embassy in Qatar.

214.    At the time Defendants made these statements, they knew them to be false. Defendants never had any intention of carrying out the representations.

215.    Defendants intentionally and knowingly made these statements with the purpose of misleading Ms. Lagasan to believe that in the United States her working conditions and wages would be better than in Qatar, and with the purpose of obtaining a visa for Ms. Lagasan, so as to traffic her into the United States and force her to work excessive hours in their home for less than minimum wage.

216.    Ms. Lagasan reasonably and justifiably relied on Defendants' representations, believing she could earn more money to send home to her family by coming to the United States than by remaining in Qatar.

217.    As a result, Ms. Lagasan suffered damages, as she was forced to work as a domestic servant for Defendants for less than minimum wage and was denied basic human rights and freedoms.

218.    Defendants committed these acts maliciously and oppressively, with the

wrongful intent of causing harm to Ms. Lagasan and in conscious disregard for her well-being.

219.   Defendants obstructed Ms. Lagasan from bringing a claim of fraud by direct and indirect means, including by confiscating her passport and travel documents and controlling her movements at all times.

220.   As a direct and proximate result of Defendants' misrepresentations, Ms. Lagasan has suffered damages, including economic and emotional harm.

221.   Ms. Lagasan is entitled to recover damages in an amount to be determined at trial, including punitive damages, attorneys' fees, and the cost of this action.

## COUNT XI

### False Imprisonment

222.   Ms. Lagasan repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

223.   At all times relevant hereto, Defendants intentionally and directly restrained Ms. Lagasan's freedom of movement and physical liberty by confining her to their home, without legal justification, through the use of words and actions that Ms. Lagasan was afraid to ignore or to which she reasonably believed she must submit.

224.   As alleged herein, Defendants knowingly confiscated and possessed Ms. Lagasan's passport and other travel documents, with the intention to prevent or restrict, or to attempt to prevent or restrict, Ms. Lagasan's ability to leave Defendants' residence.

225.   Defendants prohibited Ms. Lagasan from leaving the family's apartment complex without someone accompanying her, monitored her movements while in the apartment, and scolded her for speaking to anyone other than Defendants, all while knowing that Ms. Lagasan spoke limited English, was unfamiliar with the surrounding area, and had very little money.

226.   Ms. Lagasan was unlawfully confined in Defendants' Pittsburgh home from

approximately February 2011 through September 2011.

227.   Ms. Lagasan was unlawfully confined in Defendants' Alexandria home from approximately September 2011 through August 2012.

228.   Because of Defendants' actions, Ms. Lagasan was reasonably afraid to defy Defendants and reasonably believed that she had to submit by remaining in their home.

229.   Defendants committed these actions maliciously and intentionally, with the purpose of causing harm to Ms. Lagasan and in conscious disregard of her legal rights.

230.   As a direct and proximate result of Defendants' conduct, Ms. Lagasan suffered damages, including emotional distress, pain and humiliation, and other injuries.

231.   Ms. Lagasan is entitled to recover damages in an amount to be determined at trial, including punitive damages, attorneys' fees, and the cost of this action.

## VII.   PRAYER FOR RELIEF

232.   WHEREFORE, based on the foregoing, Ms. Lagasan hereby respectfully requests that this Court grant judgment in her favor on all of the Counts asserted in the Complaint, and award the following relief, in amounts to be determined at trial, on each Count detailed above:

a.   compensatory damages;

b.   punitive damages;

c.   attorneys' fees and costs;

d.   penalties available under applicable law;

e.   pre- and post-judgment interest available under applicable law; and

f.   such other and further relief as this Court may deem just and proper.

## VIII.   DEMAND FOR A JURY TRIAL

233.   Ms. Lagasan demands a trial by jury on all claims and issues triable as a matter of right by a jury.

Respectfully submitted,

Dated:  August 13, 2014

*Jason C. Schwartz -AMM-*

Jason C. Schwartz, Va. Bar No. 43635
Anna M. McKenzie, Va. Bar No. 84022
Molly T. Senger, *Pro Hac Vice Application Pending*
jschwartz@gibsondunn.com
amckenzie@gibsondunn.com
msenger@gibsondunn.com
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone: 202.955.8500
Facsimile:  202.467.0539

Caeli A. Higney, *Pro Hac Vice Application Pending*
chigney@gibsondunn.com
Gibson, Dunn & Crutcher LLP
555 Mission Street
San Francisco, CA 94105-2933
Telephone: 415.393.8200
Facsimile:  415.393.8306

*Attorneys for Plaintiff Armiya Bani Lagasan*