**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

ARMIYA BANI LAGASAN,

                Plaintiff,

    v.

HADBAN AL-GHASEL

    and

JIMLA AL-GHASEL also known as ZAMIA
MOHD also known as ZAMLA MOHD,

           Defendants.

Civil Action No. 1:14-cv-01035-AJT-TCB

**MEMORANDUM IN SUPPORT OF
<u>PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

PROCEDURAL BACKGROUND.............................................................................. 4

JURISDICTION AND VENUE ................................................................................. 4

ARGUMENT ............................................................................................................ 5

I.    Ms. Lagasan's Well-Pleaded Allegations Establish Defendants' Liability For Violations of the TVPA, FLSA, Breach of Contract, Fraud, and False Imprisonment...................... 6

      A.    Defendants Subjected Ms. Lagasan to Forced Labor and Involuntary Servitude in Violation of the TVPA, 18 U.S.C. §§ 1589, 1584, 1595 (Counts I and II) .......... 6

      B.    Defendants Trafficked Ms. Lagasan into the United States for the Purpose of Subjecting her to Forced Labor and Involuntary Servitude in Violation of the TVPA, 18 U.S.C. §§ 1590, 1595 (Count III)........................................................ 9

      C.    Defendants Committed Unlawful Conduct with Respect to Ms. Lagasan's Passport in Violation of the TVPA, 18 U.S.C. §§ 1592, 1595 (Count IV).......... 10

      D.    Defendants Conspired to Violate the TVPA, 18 U.S.C. §§ 1594(b), 1595 (Count VI).................................................................................................................... 11

      E.    Defendants Failed to Pay Ms. Lagasan the Federal Minimum Wage in Violation of the FLSA, 29 U.S.C. § 216 (Count VII)........................................................ 13

      F.    Defendants Breached Ms. Lagasan's Employment Contract (Count VIII) ......... 14

      G.    Defendants Made Fraudulent Statements to Ms. Lagasan to Lure Her First to Qatar and Then to the United States (Count IX)................................................ 16

      H.    Defendants Falsely Imprisoned Ms. Lagasan (Count X)..................................... 18

II.   Ms. Lagasan is Entitled to Damages in the Amount of $749,351, Plus Reasonable Attorneys' Fees ................................................................................................... 19

      A.    Ms. Lagasan is Entitled to Damages for Her Federal Claims............................. 20

            1.    Ms. Lagasan is Entitled to Damages for her TVPA Claims .................... 20

(a)     Ms. Lagasan is Entitled to Restitution in the Amount of
        $143,606.................................................................................... 21

(b)     Ms. Lagasan is Entitled to Emotional Distress Damages in the
        Amount of $226,000 ................................................................... 22

(c)     Ms. Lagasan is Entitled to Punitive Damages in the Amount of
        $369,606.................................................................................... 24

2.      Ms. Lagasan is Entitled to Damages for her FLSA Claim ...................... 26

B.      Ms. Lagasan is Entitled to Damages for her State Law Claims.......................... 26

1.      Ms. Lagasan is Entitled to Damages for Breach of Contract................... 26

2.      Ms. Lagasan is Entitled to Damages for Fraud....................................... 27

3.      Ms. Lagasan is Entitled to Damages for False Imprisonment ................ 28

Conclusion ...................................................................................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Anderson & Strudwick, Inc. v. IBD-Placement & Recruiting Servs., LLC,*
No. 3:11CV818-HEH, 2012 WL 1656504 (E.D. Va. May 10, 2012)................................. 5, 19

*Anderson v. Found. for Adv., Ed. & Emp't of Am. Indians,*
155 F.3d 500 (4th Cir. 1998) ................................................................... 19

*B&P Holdings I, LLC. v. Grand Sasso, Inc.,*
114 F. App'x 461 (3d Cir. 2004) .............................................................. 27

*Bouriez v. Carnegie Mellon Univ.,*
585 F.3d 765 (3d Cir. 2009) .................................................................... 17

*Canal v. Dann,*
No. 09-03366 CW, 2010 WL 3491136 (N.D. Cal. Sept. 2, 2010) .................................... 22, 25

*Carazani v. Zegarra,*
972 F. Supp. 2d 1 (D.D.C. 2013)........................................... 16, 23, 24, 25, 26

*Cruz v. Maypa,*
--- F.3d ----, 2014 WL 6734848 (4th Cir. 2014)................................................ 14

*David v. Signal Int'l, LLC,*
Civ. A. No. 08-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012)........................... 7

*David v. Signal Int'l, LLC,*
Civ. A. No. 08-1220, 2014 WL 5489359 (E.D. La. Aug. 13, 2014) ....................... 10

*De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP,*
792 F. Supp. 2d 812 (E.D. Pa. 2011)....................................................... 17

*Delliponti v. DeAngelis,*
681 A.2d 1261 (Pa. 1996)........................................................................ 26

*Deressa v. Gobena,*
No. 1:05CV1334(JCC), 2006 WL 335629 (E.D. Va. Feb. 13, 2006) ........................ 14

*Ditullio v. Boehm,*
662 F.3d 1091 (9th Cir. 2011) ........................................................... 20, 24

*Doe v. Howard,*
No. 1:11-cv-1105, 2012 WL 3834867 (E.D. Va. Sept. 4, 2012)............ 9, 10, 20, 21, 22, 23, 25

*Doe v. Siddig,*
810 F. Supp. 2d 127 (D.D.C. 2011)....................................................... 19

*Dutan v. Sheet Metal Remodeling, LLC,*
No. 1:14CV342 JCC/JFA, --- F. Supp. 3d -----, 2014 WL 4701166 (E.D. Va. Sept. 22, 2014)
.............................................................................................. 19, 27, 28

*E. W., LLC v. Rahman,*
   896 F. Supp. 2d 488 (E.D. Va. 2012) ................................................................... 15

*Elat v. Ngoubene,*
   993 F. Supp. 2d 497 (D. Md. 2014) ...................................................................... 12

*Eriline Co. S.A. v. Johnson,*
   440 F.3d 648 (4th Cir. 2006) ..................................................................... 14, 16, 17

*FDIC v. Danzig,*
   10 F.3d 806, 1993 WL 478842 (4th Cir. Nov. 22, 1993) ........................................ 5

*Francisco v. Susano,*
   525 Fed. App'x 828 (10th Cir. 2013) .............................................................. 22, 24

*Gen. Tel. Co. of the Nw., Inc. v. EEOC,*
   446 U.S. 318(1980) ............................................................................................. 19

*Gibbs v. Ernst,*
   647 A.2d 882 (Pa. 1994) ...................................................................................... 17

*Glass v. City of Philadelphia,*
   455 F. Supp. 2d 302 (E.D. Pa. 2006) ................................................................... 28

*Globalsantafe Corp. v. Globalsantafe.com,*
   250 F. Supp. 2d 610 (E.D. Va. 2003) ..................................................................... 5

*Gurung v. Malhotra,*
   851 F. Supp. 2d 583 (S.D.N.Y. 2012) ...................................................... 20, 22, 24

*Hammond v. Lowe's Home Centers, Inc.,*
   316 F. Supp. 2d 975 (D. Kan. 2004) .................................................................... 27

*Hutchison ex rel. Hutchison v. Luddy,*
   870 A.2d 766 (Pa. 2005) ...................................................................................... 28

*Joyner v. Sch. Dist. of Philadelphia,*
   313 F. Supp. 2d 495 (E.D. Pa. 2004) ................................................................... 18

*Kiwanuka v. Bakilana,*
   844 F. Supp. 2d 107 (D.D.C. 2012) ........................................................ 6, 8, 13, 14

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
   313 U.S. 487 (1941) ............................................................................................ 14

*Klein v. Weidner,*
   729 F.3d 280 (3d Cir. 2013) ................................................................................ 28

*Martinez v. Capitol Drywall, Inc.,*
   Civ. No. DKC 13-1563, 2014 WL 5454378 (D. Md. Oct. 24, 2014) ...................... 19

*Mazengo v. Mzengi,*
   Civ. A. No. 07-756 (RMC) (AK), 2007 WL 8026882 (D.D.C. Dec. 20, 2007) ........... 20, 22, 23

*Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Invs.,*
   951 F.2d 1399 (3d Cir. 1991) .............................................................................. 17

*Milton v. IIT Research Inst.*,
  138 F.3d 519 (4th Cir. 1998) ........................................................................ 17, 18

*Mumbower v. Callicot*,
  526 F.2d 1183 (8th Cir. 1975) ............................................................................ 14

*Music City Music v. Alfa Foods, Ltd.*,
  616 F. Supp. 1001 (E.D. Va. 1985) ...................................................................... 5

*Musselman v. Merck & Co.*,
  No. 1:06 CV 845(JCC), 2006 WL 2645174 (E.D. Va. Sept. 13, 2006) ................... 18

*Nicholas v. Pennsylvania State Univ.*,
  227 F.3d 133 (3d Cir. 2000) ................................................................................ 26

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*,
  905 F. Supp. 2d 675 (D. Md. 2012)...................................................................... 12

*Padilla v. Miller*,
  143 F. Supp. 2d 479 (M.D. Pa. 2001).................................................................... 28

*Pinkerton v. United States*,
  328 U.S. 640 (1946) .......................................................................................... 13

*Porch v. Am. K-9 Interdiction, LLC*,
  Civ. A. No. 2:12cv690, 2013 WL 4804285 (E.D. Va. Sept. 6, 2013)...................... 14

*Powers v. Lycoming Engines*,
  No. CIV.A. 06-2993, 2007 WL 2702705 (E.D. Pa. Sept. 12, 2007)....................... 14

*Quillen v. Int'l Playtex, Inc.*,
  789 F.2d 1041 (4th Cir. 1986) ............................................................................ 18

*Ramos v. Hoyle*,
  No. 08-21809-CIV, 2008 WL 5381821 (S.D. Fla. Dec. 19, 2008) ...................... 7, 8

*Roberts v. Aetna Cas. & Sur. Co.*,
  687 F. Supp. 239 (W.D. Va. 1988)........................................................................ 15

*Shukla v. Sharma*,
  No. 07-CV-2972 (CBA) (CLP), 2012 WL 481796 (E.D.N.Y. Feb. 14, 2012) ........ 26

*Sites v. Nationstar Mortgage LLC*,
  646 F. Supp. 2d 699 (M.D. Pa. 2009).................................................................... 27

*Sosnowy v. A. Perri Farms, Inc.*,
  764 F. Supp. 2d 457 (E.D.N.Y. 2011).................................................................... 27

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) .......................................................................................... 25

*Sunrise Continuing Care, LLC v. Wright*,
  671 S.E. 2d 132 (Va. 2009) ................................................................................ 15

*Tanedo v. E. Baton Rouge Parish Sch. Bd.*,
  No. SA CV10-01172 JAK (MLGx), 2012 WL 5378742 (C.D. Cal. Aug. 27, 2012)............. 10

*Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*,
    299 F. Supp. 2d 565 (E.D. Va. 2004) .................................................................. 14

*Travis v. Prime Lending*,
    No. 3:07CV00065, 2008 WL 2397330 (W.D. Va. June 12, 2008) ........................... 5

*United Gov't Sec. Officers of Am. v. Special Op. Grp., Inc.*,
    436 F. Supp. 2d 790 (E.D. Va. 2006) .................................................................. 15

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966) ........................................................................................... 5

*United States v. Alzanki*,
    54 F.3d 994 (1st Cir. 1995)................................................................................ 7

*United States v. Calimlim*,
    538 F.3d 706 (7th Cir. 2013) ............................................................................. 8

*United States v. Cummings*,
    |937 F.2d 941 (4th Cir. 1991) ........................................................................... 12

*United States v. Dann*,
    652 F.3d 1160 (9th Cir. 2011) .......................................................................... 11

*United States v. Dege*,
    364 U.S. 51 (1960) ........................................................................................... 13

*United States v. Garcia*,
    No. 02-CR-110S-01, 2003 WL 22938040 (W.D.N.Y. Dec. 2, 2003) ........................ 8

*United States v. Nnaji*,
    447 Fed. App'x 558 (5th Cir. 2011) .................................................................. 12

*Ware v. Rodale Press, Inc.*,
    322 F.3d 218 (3d Cir. 2003) .............................................................................. 15

**Statutes**

18 U.S.C. § 1584................................................................................................ 6, 7, 8

18 U.S.C. § 1589(a) ............................................................................................. 6, 7

18 U.S.C. § 1589(a)(4) ........................................................................................ 8

18 U.S.C. § 1589(b) ............................................................................................ 9

18 U.S.C. § 1589(c)(2)......................................................................................... 7, 8

18 U.S.C. § 1590 ................................................................................................ 10, 12

18 U.S.C. § 1592 ................................................................................................ 12

18 U.S.C. § 1592(a)(1)-(2)................................................................................... 10

18 U.S.C. § 1593(b)(3) ....................................................................................... 20

18 U.S.C. § 1593A .............................................................................................. 9

18 U.S.C. § 1595 ................................................................................................ 6, 10

18 U.S.C. § 1595(a) ............................................................................................ 20

18 U.S.C. § 2259(b)(3) ....................................................................................... 20

18 U.S.C. §§ 1581-1597 ................................................................................... 4, 6

22 U.S.C. § 7102(6) .............................................................................................. 6

22 U.S.C. § 7102(9)(B) ....................................................................................... 11

28 U.S.C. § 1391(b)(2) .......................................................................................... 5

29 U.S.C. § 206(a)(1)(C) ............................................................................. 13, 25

29 U.S.C. § 206(f) .............................................................................................. 13

29 U.S.C. § 213(b)(21) ....................................................................................... 13

29 U.S.C. § 216(b) ........................................................................................ 21, 25

29 U.S.C. § 255(a) .............................................................................................. 14

29 U.S.C. §§ 201-219a ......................................................................................... 4

**Rules**

Fed. R. Civ. P. 12(a)(1)(A)(i) ............................................................................. 4

**Regulations**

29 C.F.R. § 552.102(a) ....................................................................................... 13

**Other Authorities**

H.R. Rep. No. 106-939 (2000) ............................................................................. 7

Pub. L. No. 106-386, 114 Stat. 1464 § 102(b)(13) .............................................. 6

Rest. (First) of Conflict of Laws § 355 (1934) .................................................. 15

U.S. Dep't of Labor, Employment and Training Information, Prevailing Wage Information, *available at* http://www.foreignlaborcert.doleta.gov/pwscreens.cfm (last visited Dec. 15, 2014) ................................................................................................................ 16

**INTRODUCTION**

Plaintiff Armiya Bani Lagasan ("Ms. Lagasan") is a victim of human trafficking who seeks to hold her former captors liable for their violations of the Victims of Trafficking and Violence Protection Act ("TVPA"), the Fair Labor Standards Act ("FLSA"), and state law. Defendants Hadban and Jimla Al-Ghasel ("Defendants" or "Mr. and Mrs. Al-Ghasel," respectively) brought Ms. Lagasan from the Philippines through Qatar into the United States, where they forced her to work as a domestic servant and subjected her to abominable living and working conditions.  *See* Am. Compl. ¶¶ 1-2.  During the year and a half that she spent working for Defendants, Ms. Lagasan was forced to sleep on the floor of a cramped closet, *see id.* ¶ 99; she was prohibited from leaving Defendants' residence by herself for any reason, *id.* ¶¶ 108-09; and she was denied even the most basic forms of medical care, which resulted in—among other things—her need to have seven teeth pulled once she was rescued, *id.* ¶¶ 105-07.  Defendants made Ms. Lagasan work as many as 19 hours per day, cooking, cleaning, and caring for their two children, and paid her a mere ***$0.40 per hour***—in other words, 5.5% of the federal minimum wage, *id.* ¶¶ 2, 86-89; *see also* 29 U.S.C. § 206(a)(1)(C).  All alone in a country thousands of miles away from her family, with virtually no financial resources, limited ability to communicate with the outside world, and her passport confiscated by Defendants, *see* Am. Compl. ¶¶ 108-15, Ms. Lagasan remained a prisoner in Defendants' home until she was rescued by United States Immigration and Customs Enforcement ("ICE") in August 2012, *see id.* ¶¶ 5-6, 123-25.

Although Defendants absconded to Qatar shortly after Ms. Lagasan's rescue, *id.* ¶ 8, they returned to the United States in or around August 2014, *id.* ¶ 19.  On October 17, 2014, Ms. Lagasan successfully located Defendants and served them with summonses and copies of the First Amended Complaint.  *See* Proof of Service, Dkt. 9 (Oct. 21, 2014); Proof of Service, Dkt.

10 (Oct. 21, 2014).  Defendants, however, failed to answer or otherwise defend, and the Clerk of

Court therefore found them in default on November 13, 2014.  *See* Entry of Default, Dkt. 12

(Nov. 13, 2014).  Ms. Lagasan now respectfully moves pursuant to Federal Rule of Civil

Procedure 55(b) for the entry of a default judgment against Defendants.

## FACTUAL BACKGROUND

Ms. Lagasan's ordeal began in the summer of 2010, when a representative from an

agency known as "Golden Future" convinced Ms. Lagasan to travel from her native Philippines

to Qatar, with the promise of lucrative employment as a domestic servant with Defendants upon

her arrival.  *See* Am. Compl. ¶¶ 33-47.  When Ms. Lagasan arrived in Doha, representatives from

"Gulf Spring Manpower"—Golden Future's sister agency—confiscated her passport and cellular

telephone.  *Id.* ¶¶ 49-50.  At the mercy of her would-be "employers," Ms. Lagasan was taken to

the desert town of Umm Bab, where she was forced to work 19-hour days cooking and cleaning

for Defendants' relatives.  *Id.* ¶¶ 54, 56-58.  During this time, Ms. Lagasan was verbally abused,

*id.* ¶¶ 60-62; she was forced to sleep outside, where she awoke to see "trails in the sand . . . left

by snakes," *id.* ¶ 59; and she was paid a mere 730 Qatari Riyals (or $200) per month, *id.* ¶ 64.

In or around January 2011, Ms. Lagasan learned that she would be moving to the United

States to work for Defendants.  Am. Compl. ¶ 67.  Mr. Al-Ghasel's brother presented Ms.

Lagasan with an employment contract, which identified Mr. Al-Ghasel as Ms. Lagasan's

employer.  *Id.* ¶ 69.  Pursuant to the contract, Ms. Lagasan was guaranteed "the prevailing wages

of Pennsylvania."  *Id.* ¶ 70; *Id.*, Exhibit A.  The contract further specified that Ms. Lagasan

would work eight hours per day and 40 hours per week; that she would retain possession of her

passport; and that she would not be required to remain with Defendants on weekends or holidays.

*Id.*  Defendants, through Mr. Al-Ghasel's brother, used this contract—which they never intended

to honor—to obtain a visa for Ms. Lagasan to enter the United States.  *Id.* ¶¶ 71-72.

On February 12, 2011, Ms. Lagasan arrived in the United States.  Am. Compl. ¶ 76.
Shortly after her arrival, Mrs. Al-Ghasel demanded Ms. Lagasan's passport and travel
documents, which Defendants then held during Ms. Lagasan's entire period of employment.  *Id.*
¶ 82.  From February 2011 through September 2011, Ms. Lagasan worked for Defendants in
their home in Pittsburgh, Pennsylvania and was paid approximately $201 per month.  *Id.* ¶ 86.  In
September 2011, Ms. Lagasan moved with Defendants to Alexandria, Virginia, where she
continued to work for Defendants in their home, and began to receive approximately $220 per
month.  *Id.* ¶ 87.  In both Pittsburgh and Alexandria, Ms. Lagasan worked roughly 18 to 19 hours
per day, performing domestic tasks for Defendants and caring for Defendants' two children.  *Id.*
¶¶ 88-93.  Defendants did not permit Ms. Lagasan to take any breaks during the workday and did
not give her any days off.  *Id.* ¶¶ 94-95.  Throughout this time, Ms. Lagasan was subjected to
inhumane living conditions, as Defendants forced her to sleep on the floor of a cramped closet,
*id.* ¶¶ 98-102; denied her access to medical services, *id.* ¶¶ 103-07; and isolated her from the
outside world by retaining possession of her passport, prohibiting her from leaving their home by
herself, and preventing her from speaking to anyone outside their presence, *id.* ¶¶ 108-15.

In or around July 2012, a concerned neighbor who observed Defendants' treatment of
Ms. Lagasan reported Ms. Lagasan's situation to the National Human Trafficking Resource
Center.  Am. Compl. ¶ 4.  On August 30, 2012, ICE agents went to Defendants' residence to
investigate and rescued Ms. Lagasan.  *Id.* ¶¶ 123-24.  Since her rescue, Ms. Lagasan has received
extensive social services to assist with her reintegration into society and to help her recover from
the traumatic experience that she endured while in Defendants' employ.  *Id.* ¶¶ 126-28; *see also*
Exhibit A, Declaration of Ngozi Williams ("Williams Decl.") ¶¶ 8-12; *id.*, Exhibit 1, Declaration

of Timothy Jefferson ("Jefferson Decl.") ¶¶ 3-5, 10-11.  Ms. Lagasan was awarded an I-914 T-Nonimmigrant Visa ("T-visa") in April 2014, pursuant to which she may lawfully reside in the United States until 2018.  *Id.* ¶¶ 130-31.

## PROCEDURAL BACKGROUND

Ms. Lagasan initiated this action on August 13, 2014.  *See* Compl., Dkt. 1 (Aug. 13, 2014).  Upon information and belief, Defendants were residing in Qatar at the time this lawsuit was filed, *id.* ¶¶ 23-24, but returned to the United States in or around August 2014, Am. Compl. ¶ 19.  On October 17, 2014, Defendants were served with summonses and copies of the First Amended Complaint at their residence in Alexandria, Virginia.  *See* Proof of Service, Dkt. 9 (Oct. 21, 2014); Proof of Service, Dkt. 10 (Oct. 21, 2014).  The deadline for Defendants to answer or otherwise respond was November 7, 2014—*i.e.*, twenty-one (21) days after they were served.  *See* Fed. R. Civ. P. 12(a)(1)(A)(i). As of November 10, 2014, Defendants had failed to plead or otherwise defend.  *See* Pl.'s Request for Entry of Default, Dkt. 12 (Nov. 10, 2014).  Ms. Lagasan therefore requested that the Clerk enter a default against Defendants pursuant to Federal Rule of Civil Procedure 55(a).  *See id.*  On November 13, 2014, the Clerk granted Ms. Lagasan's request, and found Defendants in default.  Entry of Default, Dkt. 12 (Nov. 13, 2014).

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over Ms. Lagasan's Fair Labor Standards Act ("FLSA") and Victims of Trafficking and Violence Protection Act ("TVPA") claims pursuant to 28 U.S.C. § 1331 because those claims arise under federal law.  *See* 29 U.S.C. §§ 201-219a; 18 U.S.C. §§ 1581-1597.  In accordance with 28 U.S.C. § 1367, this Court also has subject matter jurisdiction over Ms. Lagasan's state law claims, which "form part of the same case or controversy" and "share a common nucleus of operative fact" with her federal law claims.  *See*

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); Am. Compl. ¶ 16.  Venue is proper in this District because a substantial part of the events giving rise to Ms. Lagasan's claims occurred here.  *See* 28 U.S.C. § 1391(b)(2); *see also* Am. Compl. ¶ 23.

## ARGUMENT

Pursuant to Rule 55(b) of the Federal Rules of Civil Procedure, Ms. Lagasan is entitled to the entry of a default judgment.  *See Travis v. Prime Lending*, No. 3:07CV00065, 2008 WL 2397330, at *1 (W.D. Va. June 12, 2008) (explaining that the entry of a "[d]efault judgment is appropriate when a defendant has failed to plead or otherwise defend the action") (citing *Music City Music v. Alfa Foods, Ltd.*, 616 F. Supp. 1001, 1002 (E.D. Va. 1985)).  Obtaining a default judgment is a two-step process: first, the plaintiff must request the Clerk's entry of default under Rule 55(a).  *FDIC v. Danzig*, 10 F.3d 806, 1993 WL 478842, at *3 n.5 (4th Cir. Nov. 22, 1993).  Then, after a defendant has been found in default under Rule 55(a), "and upon application by the non-defaulting party, a default *judgment* may be entered" in accordance with Rule 55(b).  *Id.*

Once a default is entered, "the well-pleaded allegations in the complaint are taken as true." *Travis*, 2008 WL 2397330, at *2.  Thus, "[i]n evaluating a request for default judgment, the district court's task is to determine whether the plaintiff's uncontested factual allegations, taken as true, state a viable cause of action." *Anderson & Strudwick, Inc. v. IBD-Placement & Recruiting Servs., LLC*, No. 3:11CV818-HEH, 2012 WL 1656504, at *1 (E.D. Va. May 10, 2012); *see also Globalsantafe Corp. v. Globalsantafe.*com, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003).  Here, accepting as true the uncontested factual allegations in the First Amended Complaint, Ms. Lagasan has stated viable causes of action against Defendants for their violations of the TVPA and FLSA, as well as for breach of contract, fraud, and false imprisonment. Accordingly, Ms. Lagasan is entitled to a default judgment in her favor on each of these claims.

I.      **Ms. Lagasan's Well-Pleaded Allegations Establish Defendants' Liability For Violations of the TVPA, FLSA, Breach of Contract, Fraud, and False Imprisonment**

A.      **Defendants Subjected Ms. Lagasan to Forced Labor and Involuntary Servitude in Violation of the TVPA, 18 U.S.C. §§ 1589, 1584, 1595 (Counts I and II)**

Ms. Lagasan has pled facts sufficient to establish Defendants' liability for forced labor and involuntary servitude in violation of the TVPA.  Section 1589(a) of the TVPA prohibits forced labor, which is defined in relevant part as "knowingly . . . obtain[ing] the labor or services of a person . . . by means of serious harm or threats of serious harm . . . ; [or] . . . by means of the abuse or threatened abuse of law or legal process; or . . . by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person . . . would suffer serious harm . . . ."  18 U.S.C. § 1589(a).  Section 1584 of the TVPA likewise prohibits involuntary servitude, which is defined in relevant part as "a condition of servitude induced by means of (A) any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person . . . would suffer serious harm . . . ; or (B) the abuse or threatened abuse of the legal process."  18 U.S.C. § 1584; 22 U.S.C. § 7102(6).  In accordance with the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581-1597, victims of forced labor and involuntary servitude "may bring a civil action against the perpetrator . . . and . . . recover damages and reasonable attorneys [sic] fees."  18 U.S.C. § 1595.

In enacting the TVPA, Congress intended to proscribe not only physical coercion to obtain forced labor, but also "'to reach cases in which persons are held in a condition of servitude through nonviolent coercion.'"  *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 114-15 (D.D.C. 2012) (quoting Pub. L. No. 106-386, 114 Stat. 1464 § 102(b)(13)).  To combat these "'increasingly subtle methods of traffickers who place their victims in modern-day slavery,'" *id.*

(quoting H.R. Rep. No. 106-939, at 101 (2000)), the TVPA defines "serious harm" to mean "any

harm, whether physical or nonphysical, including psychological . . . [or] financial . . . harm," so

long as the harm "is sufficiently serious, under all the surrounding circumstances, to compel a

reasonable person of the same background and in the same circumstances . . . to continue

performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c)(2).

 In assessing whether harm is sufficiently "serious" within the meaning of the TVPA, "the

vulnerabilities and characteristics of the specific victim become extremely important because one

individual could be impervious to some types of coercion that cause another to acquiesce in

providing forced labor."  *David v. Signal Int'l, LLC*, Civ. A. No. 08-1220, 2012 WL 10759668,

at *19-20 (E.D. La. Jan. 4, 2012).  For this reason, it is "irrelevant" whether a trafficking victim

actually "had the opportunity to escape."  *Ramos v. Hoyle*, No. 08-21809-CIV, 2008 WL

5381821, at *5 (S.D. Fla. Dec. 19, 2008).  Instead, the relevant inquiry is whether the defendant

"intentionally cause[d] the oppressed person reasonably to believe, given her 'special

vulnerabilities,' that she ha[d] no alternative but to remain in involuntary service for a time.'"

*United States v. Alzanki*, 54 F.3d 994, 1000 (1st Cir. 1995); *see also David*, 2012 WL 10759668,

at *20 (explaining that the "serious harm" contemplated by the TVPA must be such that it causes

"a reasonable person *in the victim's shoes* to render forced labor") (emphasis added).

 Here, Defendants intentionally engaged in a scheme, plan, or pattern designed to cause

Ms. Lagasan to reasonably believe that she had no alternative but to remain in their employ or

suffer serious harm.  *See* 18 U.S.C. §§ 1589(a), 1584.  Defendants effectuated their scheme by

trafficking Ms. Lagasan from the Philippines through Qatar into the United States, *id.* Am.

Compl. ¶¶ 1-2, 156; confiscating Ms. Lagasan's passport and travel documents, *id.* ¶¶ 82, 115,

119, 123; confining Ms. Lagasan to their residence, *id.* ¶¶ 89, 108-11; reprimanding Ms. Lagasan

for speaking with anyone other than themselves, *id.* ¶¶ 83, 111-13; prohibiting Ms. Lagasan from obtaining necessary medical services, *id.* ¶¶ 103-06; threatening to reduce or withhold Ms. Lagasan's pay if they caught her "sitting and not doing work," *id.* ¶ 96; telling Ms. Lagasan that they "did not care" about the terms of her employment contract, *id.* ¶ 97; and refusing to respond to Ms. Lagasan's repeated requests to return home to the Philippines, *id.* ¶ 115.  Defendants also threatened abuse of the legal process by confiscating Ms. Lagasan's passport and travel documents, thereby causing her to believe that if she attempted to escape, she would suffer arrest or deportation.  *See id.* ¶¶ 115; 133-40; *see also Kiwanuka*, 844 F. Supp. 2d at 115 (explaining that "many courts have determined that threats of deportation constitute a condition of servitude induced through abuse of the legal process") (citing *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2013); *Ramos*, 2008 WL 5381821, at *4 (S.D. Fla. 2008); *United States v. Garcia*, No. 02-CR-110S-01, 2003 WL 22938040, at *4 (W.D.N.Y. Dec. 2, 2003)).

Under these circumstances, a reasonable person of the same background as Ms. Lagasan—that is, a person who knew no one in the United States aside from her traffickers, spoke limited English, and possessed meager financial resources—would feel "terrified to leave" and compelled to continue working for Defendants.  Am. Compl. ¶ 115; *see also* 18 U.S.C. §§ 1589(a)(4), (c)(2), 1584.  Ms. Lagasan thus is entitled to a default judgment against Defendants for their violations of Sections 1589(a) and 1584 of the TVPA.  *See, e.g.*, *Ramos*, 2008 WL 5381821, at *5 (finding allegations sufficient to state a TVPA claim where "in addition to keeping [the plaintiffs'] passports and immigration papers, Defendants [had] . . . violated their previous agreement by failing to pay [the plaintiffs] promised wages, forced them to live in a converted closet, [and] instructed at least [one plaintiff] not to talk to certain persons because they had encouraged [the plaintiff] to escape"); *Doe v. Howard*, No. 1:11-cv-1105, 2012 WL

3834867, at *1 (E.D. Va. Sept. 4, 2012) (holding the defendants liable for forced labor and

involuntary servitude where they "psychologically manipulated" the plaintiff by, among other

things, "limit[ing] [her] contact with the outside world" and threatening her with deportation).

So, too, has Ms. Lagasan pled facts sufficient to state a claim against Defendants under

18 U.S.C. § 1589(b) of the TVPA, which prohibits persons from "knowingly benefit[ting],

financially or by receiving anything of value, from participation in a venture" that violates the

TVPA's forced labor provision.  18 U.S.C. § 1589(b).  Here, Defendants knowingly benefited

from their participation in the scheme or venture designed to procure Ms. Lagasan's forced labor,

as they received the benefit of Ms. Lagasan's cooking, cleaning, and caregiving services for far

less than what they knew to be the actual value of those services.  *See* Am. Compl. ¶¶ 86-87, 97,

141-42, 172-73.  Defendants' knowledge is evidenced by, among other things, the fact that they

presented Ms. Lagasan with an employment contract that promised her the "prevailing wages of

Pennsylvania," *id.* ¶ 70, but then refused to honor the terms of that contract, *id.* ¶ 97.  Because

Defendants knowingly benefited from their violations of the TVPA's forced labor provision, Ms.

Lagasan is entitled to a default judgment against Defendants on her 18 U.S.C. § 1589(b) claim.[1]

**B.     Defendants Trafficked Ms. Lagasan into the United States for the Purpose of
        Subjecting her to Forced Labor and Involuntary Servitude in Violation of
        the TVPA, 18 U.S.C. §§ 1590, 1595 (Count III)**

Ms. Lagasan also has properly pled a claim against Defendants under Section 1590 of the

TVPA.  Section 1590 prohibits the trafficking of persons from foreign countries "into the United

---

[1]   Ms. Lagasan also is entitled to a default judgment against Defendants under 18 U.S.C. §
1593A (Count V).  Section 1593A establishes liability for persons who "knowingly benefit[],
financially or by receiving anything of value, from participation in a venture which has
engaged in any act" in violation of the TVPA, "knowing or in reckless disregard of the fact
that the venture has engaged in such a violation."  As set forth above, Defendants knowingly
benefited financially from their participation in a venture that engaged in acts in violation of
the TVPA and Defendants knew that their venture was completing such acts.  Defendants
thus are liable under Section 1593A as well as Section 1589(b).  *See* 18 U.S.C. § 1593A.

States, including for the purpose of compelling forced labor here." *Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. SA CV10-01172 JAK (MLGx), 2012 WL 5378742, at *6 (C.D. Cal. Aug. 27, 2012). In particular, Section 1590—together with Section 1595—establishes a civil cause of action "against any person who 'knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services'" in violation of the TVPA. *David v. Signal Int'l., LLC*, Civ. A. No. 08-1220, 2014 WL 5489359, at *5 (E.D. La. Aug. 13, 2014) (quoting 18 U.S.C. § 1590); *see also* 18 U.S.C. § 1595. As set forth in Ms. Lagasan's First Amended Complaint, Defendants—through the Golden Future agency—knowingly recruited Ms. Lagasan to travel from the Philippines to Qatar with the promise of lucrative employment as their domestic servant upon her arrival. *See* Am. Compl. ¶¶ 35-48. Then, after Ms. Lagasan spent several months working for Defendants' relatives in Qatar, *see id.* ¶¶ 48-63, Defendants— through Mr. Al-Ghasel's brother—fraudulently procured a visa for Ms. Lagasan so that she could travel to the United States, *id.* ¶¶ 67-74, with the purpose of subjecting her to involuntary servitude and forced labor in this country, *see supra* § I.A. Based on these undisputed facts, Ms. Lagasan has sufficiently stated a trafficking claim against Defendants under Section 1590 of the TVPA, *see David*, 2014 WL 5489359, at *5; *see also Howard*, 2012 WL 3834867, at *1, and is therefore entitled to the entry of a default judgment against Defendants on Count III.

### C.   Defendants Committed Unlawful Conduct with Respect to Ms. Lagasan's Passport in Violation of the TVPA, 18 U.S.C. §§ 1592, 1595 (Count IV)

Ms. Lagasan likewise has pled facts sufficient to establish a so-called "document servitude" claim against Defendants pursuant to Section 1592 of the TVPA. Under 18 U.S.C. § 1592(a)(1)-(2), it is unlawful for persons to "knowingly . . . conceal[] . . . confiscate, or possess[] any actual or purported passport or other immigration document" in the course of violating the TVPA, or with the intent to violate the TVPA. Here, Defendants knowingly confiscated,

concealed, and possessed Ms. Lagasan's passport and travel documents throughout her

employment, *see* Am. Compl. ¶¶ 2, 39, 49, 72, 82, 97, 115, 119, 123; these acts were undertaken

by Defendants in the course of and with the intent to commit forced labor and involuntary

servitude in violation of the TVPA, *id.* ¶¶ 138, 149, 163-65; and Defendants acted knowingly in

committing these acts, *id.* ¶¶ 82, 97, 115, 119, 123, 138, 149, 163-65, 225.  *See United States v.*

*Dann*, 652 F.3d 1160, 1173 (9th Cir. 2011).  Accordingly, Ms. Lagasan respectfully requests that

the Court enter a default judgment in her favor on Count IV.[2]

### D.   Defendants Conspired to Violate the TVPA, 18 U.S.C. §§ 1594(b), 1595 (Count VI)

The allegations of the First Amended Complaint also are sufficient to show that

Defendants engaged in a conspiracy in violation of Section 1594(b) of the TVPA.  Section

1594(b) provides that "[w]hoever conspires with another to violate section . . . 1589, 1590, or

1592 shall be punished in the same manner as a completed violation of such section."  A

conspiracy exists where the following three elements are present: "'(i) a confederation of two or

more persons by agreement or understanding; (ii) some unlawful or tortious act done in

---

[2] Defendants additionally violated Section 1592(a)(3) of the TVPA, which prohibits knowingly concealing, confiscating, or possessing the passport of another person "to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons."  Ms. Lagasan is a victim of severe trafficking because Defendants recruited, transported, and obtained Ms. Lagasan's labor and services through the use of fraud and coercion, in order to subject her to involuntary servitude.  *See* 22 U.S.C. § 7102(9)(B); *supra* § I.A-B; Am. Compl. ¶ 166; *see also* Exhibit B, Declaration of Armiya Bani Lagasan ("Lagasan Decl."), Exhibit 3, Letter from Dep't of Health and Human Resources (certifying Ms. Lagasan under section 107(b)(1)(E) of the TVPA as a person willing to assist in the investigation and prosecution of "severe forms of trafficking in persons" based on her experience working for Defendants).  Moreover, Defendants knowingly confiscated, possessed, and concealed Ms. Lagasan's passport and travel documents with the intent of restricting her ability to leave their home in order to continue receiving the benefit of her forced labor.  *See* Am. Compl. ¶¶ 2, 39, 49, 72, 82, 97, 115, 119, 123, 138, 149, 163-65, 225. Defendants therefore are liable for violating Section 1592(a)(3) of the TVPA in addition to Sections 1592(a)(1) and 1592(a)(2).

furtherance of the conspiracy . . . ; and (iii) actual legal damage resulting to the plaintiff.'" *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 531 (D. Md. 2014) (quoting *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 696 (D. Md. 2012)).  Accordingly, courts have found conspiracies to violate the TVPA where—as here—two or more family members work together to take "advantage of the victim's vulnerabilities and coerce[] her into performing work for the family," such as by taking "the victim's travel documents . . . prohibiting her from making contact with outsiders, . . . and accompanying her whenever she le[aves] the house." *United States v. Nnaji*, 447 Fed. App'x 558, 560 (5th Cir. 2011); *see also Elat*, 993 F. Supp. 2d at 532 (finding TVPA conspiracy amongst family members who pressured trafficking victim "to stay as a laborer in their home through subtle and implied (but nonetheless real) threats of deportation, and through psychological manipulation based on [the victim's] immigration status, educational goals, family history, and the specter of the . . . family's political influence").

In this case, Mr. and Mrs. Al-Ghasel reached an agreement to procure Ms. Lagasan's forced labor and involuntary servitude and committed several unlawful acts in furtherance of their conspiracy, by trafficking Ms. Lagasan from the Philippines through Qatar into the United States in violation of 18 U.S.C. § 1590, *see supra* § I.B., and by confiscating Ms. Lagasan's passport and travel documents in violation of 18 U.S.C. § 1592, *see supra* § I.C; Am. Compl. ¶¶ 180-81.  Defendants committed these acts together, as well as with others—such as Mr. Al-Ghasel's brother and representatives from the Golden Future agency, *id.*—and therefore are liable "for all reasonably foreseeable acts of their co-conspirators done in furtherance of the conspiracy." *United States v. Cummings*, 937 F.2d 941, 944 (4th Cir. 1991) (explaining that the Fourth Circuit recognizes "the full breadth of the conspiracy doctrine" set forth in *Pinkerton v.*

*United States*, 328 U.S. 640 (1946)).[3]  Moreover, as set forth below, Defendants through their

conspiracy caused Ms. Lagasan to suffer actual legal damage.  *See infra* § II.  For all these

reasons, Ms. Lagasan is entitled to a default judgment against Defendants on Count VI.

>    **E.    Defendants Failed to Pay Ms. Lagasan the Federal Minimum Wage in
>          Violation of the FLSA, 29 U.S.C. § 216 (Count VII)**

In addition to their manifold violations of the TVPA, Defendants also willfully violated

the FLSA by refusing to pay Ms. Lagasan the statutorily-required minimum wage for her work

as their domestic servant.  The FLSA provides that any employee "who in any workweek is

employed in domestic service in a household shall be paid" a minimum wage—which,

throughout Ms. Lagasan's employment with Defendants, was $7.25 per hour.  29 U.S.C. §§

206(f), 206(a)(1)(C).  Although persons "employed in domestic service in a household . . . who

reside[] in such household" are exempt from the FLSA's time-and-a-half overtime requirements,

*see* 29 U.S.C. § 213(b)(21), "the exemption in § 213(b)(21) 'does not excuse the employer from

paying the live-in worker at the applicable minimum wage rate for all hours worked.'"

*Kiwanuka*, 844 F. Supp. 2d at 117 (quoting 29 C.F.R. § 552.102(a)).

Ms. Lagasan resided in Defendants' household and performed domestic services for

Defendants from approximately February 12, 2011 until she was rescued on August 30, 2012—a

period of about 18 months.  Am. Compl. ¶¶ 22-23, 76, 123.  Throughout this time, Ms. Lagasan

worked 18 or 19 hours per day, *see id.* ¶¶ 2, 88, 137, but was generally paid between $201 and

$220 per month, *id.* ¶¶ 86-87—in other words, approximately $0.40 per hour, *id.* ¶¶ 2, 85-87,

137.  Because the uncontested facts demonstrate that Defendants willfully paid Ms. Lagasan far

---

[3]  The fact that Defendants are married does not place them outside the scope of the TVPA's
conspiracy provision.  *Cf. United States v. Dege*, 364 U.S. 51, 52 (1960) (rejecting "[t]he
claim that husband and wife are outside the scope of [a statute] making it an offense for two
persons to conspire" as predicated on "medieval views regarding the legal status of
wom[e]n").

less than the federally-mandated $7.25 minimum wage, Ms. Lagasan is entitled to a default

judgment against Defendants with respect to her FLSA claim in Count VII.[4]

### F.      Defendants Breached Ms. Lagasan's Employment Contract (Count VIII)

Ms. Lagasan also has properly pled a breach of contract claim against Defendants.[5]

Under Virginia choice-of-law rules,[6] "actions concerning the performance of a contract," such as

---

[4]  The FLSA requires that an action seeking unpaid wages "be commenced within two years after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).  A cause of action under the FLSA accrues at the end of each workday. *See Deressa v. Gobena*, No. 1:05CV1334(JCC), 2006 WL 335629, at *3 (E.D. Va. Feb. 13, 2006).  Because Defendants' violation of the FLSA was willful, Ms. Lagasan is entitled to the benefit of the FLSA's three-year statute of limitations. *See, e.g.*, Am. Compl. ¶¶ 149, 189.  At first blush, even with the benefit of the three-year statute of limitations, it would seem that Ms. Lagasan's FLSA claims with respect to work performed for Defendants prior to August 13, 2011 (the date three years prior to the filing of her Complaint) are time-barred. For two reasons, however, Ms. Lagasan's claims under the FLSA are not time-barred. *First*, because the FLSA's statute of limitations "was intended to serve as a conventional limitation on the remedy, not upon the right to bring the action," it must be "pleaded as an affirmative defense" or it is waived. *Mumbower v. Callicot*, 526 F.2d 1183, 1187 n.5 (8th Cir. 1975); *see also Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653-55, 657 (4th Cir. 2006) (holding that a "statute of limitations is an affirmative defense," which the defendant "bears the burden of affirmatively pleading").  By failing to plead or otherwise defend, Defendants have waived their right to assert a statute of limitations defense to Ms. Lagasan's FLSA claims. *Second*, courts in this Circuit have found that where, as here, a trafficking victim is held in involuntary servitude and therefore is unable to initiate a lawsuit to enforce her rights, the FLSA's statute of limitations is equitably tolled until the date she is rescued. *Deressa*, 2006 WL 335629, at *3-4; *Cruz v. Maypa*, --- F.3d ----, 2014 WL 6734848, at *6 (4th Cir. 2014); *see also Kiwanuka*, 844 F. Supp. 2d at 118-19.  Thus, even if Defendants had raised a statute of limitations defense to Ms. Lagasan's FLSA claims, Ms. Lagasan still would be entitled to equitable tolling up to and including the date of her rescue on August 30, 2012, and thus, all of her FLSA claims are timely. *See* Am. Compl. ¶¶ 6, 123.

[5]  In the alternative to her breach of contract claim, Ms. Lagasan seeks to recover the value of her services under the equitable doctrines of quantum meruit and unjust enrichment. *See* Am. Compl. ¶¶ 203-10 (Count IX); *see also Powers v. Lycoming Engines*, No. CIV.A. 06-2993, 2007 WL 2702705, at *3 (E.D. Pa. Sept. 12, 2007) (setting forth the elements of an unjust enrichment claim); *see also Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 576 (E.D. Va. 2004) (same).

[6]  It is well-established that "[a] federal court exercising supplemental jurisdiction applies the choice of law rules of the forum state"—*i.e.*, Virginia's choice of law rules. *Porch v. Am. K-9 Interdiction, LLC*, Civ. A. No. 2:12cv690, 2013 WL 4804285, at *11 (E.D. Va. Sept. 6, 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)).

actions alleging a contractual breach, "are governed by the law of the place of performance."

*United Gov't Sec. Officers of Am. v. Special Op. Grp., Inc.*, 436 F. Supp. 2d 790, 792 (E.D. Va.

2006).  Ms. Lagasan's employment contract was intended to be performed in Pennsylvania, as

evidenced by the fact that (1) the contract guarantees Ms. Lagasan the "prevailing wages of

Pennsylvania," and (2) Defendants resided in Pennsylvania at the time the contract was executed

and Ms. Lagasan agreed to provide them with domestic services in the United States.  *See* Am.

Compl. ¶ 196; *id.*, Ex. A; Lagasan Decl. ¶ 4.  Thus, Pennsylvania law governs Ms. Lagasan's

breach of contract claim.[7]

     In order to establish a claim for breach of contract under Pennsylvania law, a plaintiff

must prove that (1) there is a legally enforceable agreement; (2) the agreement was breached;

and (3) damages resulted from the breach.  *See Ware*, 322 F.3d at 225.  Here, Ms. Lagasan

entered into a legally enforceable employment agreement with Defendants, which was supported

---

[7]  Ms. Lagasan performed domestic services for Defendants in both Pennsylvania and Virginia.
Where a contract is "to be performed in multiple states," courts have held that "the choice-of-
law analysis reverts back to the place where the contract was made," *E. W., LLC v. Rahman*,
896 F. Supp. 2d 488, 511 (E.D. Va. 2012), *if* the two places of performance have "different
local law rules on the particular issue," *Roberts v. Aetna Cas. & Sur. Co.*, 687 F. Supp. 239,
241 (W.D. Va. 1988) (internal quotation and citation marks omitted).  Here, however, there is
no basis to conclude that performance in Virginia was contemplated at the time that the
employment agreement was made, and therefore, the fact that the contract ultimately was
performed in both Pennsylvania and Virginia need not factor into the choice-of-law analysis.
*See* Rest. (First) of Conflict of Laws § 355 (1934).  In any event, the two states where the
contract was performed do not have "different local law rules on the particular issue,"
because the elements of a breach of contract action are the same under Pennsylvania and
Virginia law.  *Compare Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)
("Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract
action must establish (1) the existence of a contract, including its essential terms, (2) a breach
of a duty imposed by the contract[,] and (3) resultant damages.") (internal quotation marks
and citations omitted) *with Sunrise Continuing Care, LLC v. Wright*, 671 S.E. 2d 132, 135
(Va. 2009) ("The elements of a breach of contract action are (1) a legally enforceable
obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that
obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.")
(internal quotation marks and citations omitted).

by adequate consideration and memorialized in writing.  *See* Am. Compl. ¶ 194; *id.*, Ex. A.

Pursuant to the terms of this agreement, Defendants were required to pay Ms. Lagasan "the

prevailing wages of Pennsylvania per hour."  *Id.* ¶ 195.  The prevailing wage in Pittsburgh,

Pennsylvania for "Maids and Housekeeping Cleaners" at the time Ms. Lagasan and Defendants

entered into their employment contract was $8.22 per hour.  *See* Exhibit C, Declaration of A.

McKenzie ("McKenzie Decl."), Exhibit 1.[8]  Defendants thus breached their obligation to pay Ms.

Lagasan these "prevailing wages" by paying her only $201 dollars per month while she was

employed in Pennsylvania and $220 per month while she was employed in Virginia—which,

based on the 18 or 19 hours per day that Ms. Lagasan worked, equates to about $0.40 per hour.

*See* Am. Compl. ¶¶ 2, 85-87, 137.  As a result of Defendants' contractual breach, Ms. Lagasan

suffered financial loss.  *See infra* § II.[9]  Ms. Lagasan thus has set forth well-pleaded allegations

supporting her entitlement to a default judgment against Defendants for breach of contract.

### G. Defendants Made Fraudulent Statements to Ms. Lagasan to Lure Her First to Qatar and Then to the United States (Count IX)

Ms. Lagasan also has alleged facts sufficient to support her claim for common law

fraud.[10]  To prevail on a fraud claim under Pennsylvania law,[11] a plaintiff must demonstrate that

---

[8]   The Foreign Labor Certification Data Center Online Wage Library maintains wage data collected pursuant to the U.S. Department of Labor's Occupational Employment Statistics program.  *See* U.S. Dep't of Labor, Employment and Training Information, Prevailing Wage Information, *available at* http://www.foreignlaborcert.doleta.gov/pwscreens.cfm (last visited Dec. 15, 2014).  Courts often look to this data where, as here, an employment contract specifies that an employee shall be paid "the prevailing wage."  *See, e.g.*, *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 18 (D.D.C. 2013).

[9]   Defendants also breached Ms. Lagasan's employment contract by requiring Ms. Lagasan to work more hours than permitted by the terms of the agreement; by failing to provide her with any days off; by confiscating her passport; and by restricting her freedom of movement.  *See, e.g.*, Am. Compl. ¶¶ 82, 88, 94-95, 97, 199.

[10]   Expiration of the relevant statute of limitations periods, if any, does not bar any of Ms. Lagasan's common law tort claims.  A "statute of limitations is an affirmative defense," which the defendant "bears the burden of affirmatively pleading."  *Eriline Co.*, 440 F.3d at

16

the defendant knowingly or recklessly made a false statement of material fact with the intent to

mislead the plaintiff, and that the plaintiff did, in fact, reasonably rely on the statement and was

thereby injured.  *See Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) (citing

*Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).  Although an unfulfilled promise is ordinarily not

actionable as fraud, "'[a] statement of present intention which is false when uttered may

constitute a fraudulent misrepresentation of fact.'"  *De Lage Landen Fin. Servs., Inc. v. Rasa

Floors, LP*, 792 F. Supp. 2d 812, 838 (E.D. Pa. 2011) (quoting *Mellon Bank Corp. v. First Union

Real Estate Equity & Mortg. Invs.*, 951 F.2d 1399, 1410 (3d Cir. 1991)).

   Here, Defendants made a series of false statements to Ms. Lagasan, which they knew to

be false at the time they were uttered.  *See, e.g.*, Am. Compl. ¶ 213.  Specifically, Defendants

represented to Ms. Lagasan through the Golden Future agency that she would be paid $400 per

month if she chose to accept employment with them by traveling to Qatar.  *Id.* ¶¶ 35, 44, 47.

Then, once Ms. Lagasan arrived in Qatar, she was told that her salary would be only $200 per

month—in other words, half of what she had been promised before leaving the Philippines.  *Id.* ¶

51.  After Ms. Lagasan spent several months working for Defendants' relatives in Qatar—and

received even *less* than $200 per month for her services, *id.* ¶ 64—Defendants again falsely

assured Ms. Lagasan that if she traveled to the United States to work for them, she would be paid

the "prevailing wages" in Pennsylvania; that she would have freedom of movement; that she

---

653-55, 557.  Because Defendants have "failed to raise a statute of limitations defense by
way of [their] answer," they have waived this defense.  *Id.* at 654-55; *see also supra* n.4.

[11]  In tort actions, including actions for fraud, Virginia applies the rule of *lex loci delicti* and
"selects the law of the state in which the wrongful act took place."  *Milton v. IIT Research
Inst.*, 138 F.3d 519, 521-22 (4th Cir. 1998).  Here, Defendants' wrongful fraudulent conduct
occurred in Pennsylvania—the state in which they resided at the time they lured Ms. Lagasan
to travel first to Qatar and then to the United States through false promises regarding Ms.
Lagasan's wages, hours and working conditions.  *See* Lagasan Decl. ¶ 4.  Accordingly,
Pennsylvania law governs Ms. Lagasan's fraud claim.

would have two days off per week; and that her passport would remain in her possession.  *Id.* ¶¶ 70, 199, 214.  At the time that Defendants made these promises, they had no intention of honoring them.  *Id.* ¶ 215; *cf. id.* ¶ 97.  Instead, Defendants made these promises with the purpose of luring Ms. Lagasan first to Qatar, and then to the United States, so that they could subject her to forced labor and involuntary servitude.  *Id.* ¶ 216.  Ms. Lagasan justifiably and reasonably relied on Defendant's representations in choosing to leave the Philippines to travel to Qatar and then the United States.  *Id.* ¶ 217.  And, as a result of her reliance on Defendants' false representations, Ms. Lagasan was injured, insofar as she was denied the wages she was promised and forced to endure abominable living and working conditions.  *Id.* ¶ 218; *see also infra* § II.  Ms. Lagasan therefore has sufficiently pled a common law fraud claim against Defendants.

### H.  Defendants Falsely Imprisoned Ms. Lagasan (Count X)

Finally, Ms. Lagasan has properly alleged a false imprisonment claim against Defendants.[12]  Under Pennsylvania law, "an actor is liable for false imprisonment if: (1) she acts intending to confine a person within boundaries fixed by the actor; (2) her act directly or indirectly results in such confinement of that person . . . (3) the person confined is conscious of the confinement or is harmed by it and (4) the confinement is unlawful."  *Joyner v. Sch. Dist. of Philadelphia*, 313 F. Supp. 2d 495, 502 (E.D. Pa. 2004) (internal quotation marks and citations omitted).  Defendants intentionally confined Ms. Lagasan by confiscating her passport and travel documents, Am. Compl. ¶¶ 82, 115, 119, 123, and prohibiting her from leaving their home

---

[12]  "Virginia law defines the place of the wrong as 'the place where the last event necessary to make an act liable for an alleged tort takes place.'"  *Musselman v. Merck & Co.*, No. 1:06 CV 845(JCC), 2006 WL 2645174, at *2 (E.D. Va. Sept. 13, 2006) (quoting *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986)).  The last event necessary to make Defendants liable for Ms. Lagasan's false imprisonment occurred when they confiscated Ms. Lagasan's passport upon her arrival in Pennsylvania and prevented her from leaving their home unsupervised.  Thus, under Virginia's rule of *lex loci delicti*, Pennsylvania law governs Ms. Lagasan's false imprisonment claim.  *See Milton*, 138 F.3d at 521-22; *supra* n.10.

unsupervised, *id.* ¶¶ 89, 108-11.  Based on these uncontested facts, Ms. Lagasan is entitled to the

entry of a default judgment against Defendants on her false imprisonment claim.  *See generally*

*Doe v. Siddig*, 810 F. Supp. 2d 127, 130-31, 137 (D.D.C. 2011) (holding that a trafficking victim

had adequately stated a false imprisonment claim under Virginia law where she alleged that the

defendants "confiscated her passport, prohibited her from leaving the house alone, and told her

that if she did ever leave the house alone, 'she would be kidnapped or arrested.'").

## II.     Ms. Lagasan is Entitled to Damages in the Amount of $749,351, Plus Reasonable Attorneys' Fees

Having set forth facts sufficient to state causes of action against Defendants under the

TVPA, FLSA, and state law, Ms. Lagasan is entitled to a finding of liability on Counts I-VIII,

and Count X of the First Amended Complaint.[13]  In the context of a default judgment, once

liability has been determined, the Court "may conduct a formal evidentiary hearing" to assess

damages, but "need not do so . . . if the damages can be ascertained based on detailed affidavits

or documents attached to the plaintiff's motion."  *Anderson*, 2012 WL 1656504, at *4 (citing

*Anderson v. Found. for Adv., Ed. & Emp't of Am. Indians*, 155 F.3d 500, 507 (4th Cir. 1998));

*see also Martinez v. Capitol Drywall, Inc.*, Civ. No. DKC 13-1563, 2014 WL 5454378 (D. Md.

Oct. 24, 2014).  In determining the proper amount of damages, courts "can and should preclude

double recovery by an individual" for the same injury.  *Dutan v. Sheet Metal Remodeling, LLC*,

--- F. Supp. 3d -----, No. 1:14CV342 JCC/JFA, 2014 WL 4701166, at *8 (E.D. Va. Sept. 22,

2014) (quoting *Gen. Tel. Co. of the Nw.*, *Inc. v. EEOC*, 446 U.S. 318, 333 (1980)).

The documentary evidence in this case demonstrates that Ms. Lagasan is entitled to a

total damages award of $749,351, plus reasonable attorneys' fees.  Because Ms. Lagasan's

damages all arise from the same underlying injury and conduct—namely, Defendants' trafficking

---

[13]   As set forth above, Ms. Lagasan's quantum meruit/unjust enrichment claim in Count IX is
pled in the alternative to her breach of contract claim in Count VIII.  *See supra* n.5.

Ms. Lagasan from the Philippines through Qatar into the United States, subjecting her to forced labor and involuntary servitude, and refusing to pay her the wages to which she was statutorily and contractually entitled—Ms. Lagasan only seeks a damages award pursuant to her TVPA claims (in the amount of $739,212) and her breach of contract claim (in an additional amount of $10,139), plus reasonable attorneys' fees.  Nevertheless, in the event that the Court declines to award Ms. Lagasan all or some of the damages that she seeks in connection with Defendants' violations of the TVPA and breach of contract, Ms. Lagasan requests that she be awarded damages under the FLSA, and for fraud and false imprisonment, for the reasons set forth below.

### A.      Ms. Lagasan is Entitled to Damages for Her Federal Claims

#### 1.      Ms. Lagasan is Entitled to Damages for her TVPA Claims

The TVPA permits the recovery of compensatory and punitive damages, as well as reasonable attorneys' fees.  *See Howard*, 2012 WL 3834867, at *2 (citing 18 U.S.C. § 1595(a); *Ditullio v. Boehm*, 662 F.3d 1091, 1100 (9th Cir. 2011)); *see also* 18 U.S.C. § 1595(a).  With respect to compensatory damages, the TVPA mandates that trafficking victims receive restitution for "the full amount of [their] losses," which includes "the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act," 18 U.S.C. §§ 1593(b)(3), 2259(b)(3).  In addition, trafficking victims are entitled to recover emotional distress damages as a form of compensatory damages under the TVPA.  *See Howard*, 2012 WL 3834867, at *2 (citing *Gurung v. Malhotra*, 851 F. Supp. 2d 583, 594 (S.D.N.Y. 2012); *Mazengo v. Mzengi*, Civ. A. No. 07-756 (RMC) (AK), 2007 WL 8026882, at *7 (D.D.C. Dec. 20, 2007)).  For the reasons described below, Ms. Lagasan is entitled to recover compensatory damages from Defendants in the amount of $369,606 (comprised of $143,606 in restitution and $226,000 in emotional distress damages), and an equivalent amount in punitive damages, for a total damages award of $739,212 under the TVPA, plus reasonable attorneys' fees.

(a)      *Ms. Lagasan is Entitled to Restitution in the Amount of $143,606*

The FLSA establishes the "standard methodology under which to calculate damages for

forced labor . . . [in] the TVPA framework." *Howard*, 2012 WL 3834867, at *6. Pursuant to the

FLSA, employees are entitled to recover unpaid wages, as well as an equal amount in liquidated

damages. *See id.*; *see also* 29 U.S.C. § 216(b). "The purpose of the liquidated damages

provision 'is not penal in nature but constitutes compensation for the retention of a workman's

pay which might result in damages too obscure and difficult of proof for estimate.'" *Carazani v.*

*Zegarra*, 972 F. Supp. 2d 1, 22 (D.D.C. 2013) (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S.

697, 707 (1945)). Courts in the Fourth Circuit have held that liquidated damages under the

FLSA are appropriate as part of a TVPA restitution award. *See Howard*, 2012 WL 3834867, at

*2; *see also Carazani*, 972 F. Supp. 2d at 23 (explaining that "[t]he FLSA liquidated damages

provision applies to restitution awards under the TVPA").

Ms. Lagasan performed domestic services for Defendants from approximately February

12, 2011 until she was rescued on August 30, 2012—*i.e.*, 565 days. Am. Compl. ¶¶ 22-23, 76,

123. Throughout this time, Ms. Lagasan worked 18 or 19 hours per day, seven days a week,

with no time off. *See id.* ¶¶ 2, 88, 137, 199. Ms. Lagasan was paid approximately $201 per

month while she was working for Defendants in Pennsylvania, and approximately $220 per

month while she was working for Defendants in Virginia, as well as one $200 bonus during the

month of Ramadan in 2012. *Id.* ¶¶ 86-87; *see also* Lagasan Decl. ¶¶ 6-13, Exhibit 2 (setting

forth the precise amounts that Ms. Lagasan was paid each month—*i.e.*, $271 in March 2011;

$340 in May 2011; $201 per month from June 2011 through December 2011; $220 on December

31, 2011; and $220 per month from January 2012 through July 2012, as well as a $200 bonus

during Ramadan in 2012). Thus, for this entire period, Ms. Lagasan was paid a total of $271 +

$340 + (\$201 \times 7) + (\$220 \times 8) + \$200 = \$3,978$. The federal minimum wage during this timeframe was $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). Ms. Lagasan therefore is entitled to unpaid wages in the amount of approximately ($7.25 per hour) x (18.5 hours per day) x (565 days) = $75,781, less the $3,978 paid to her by Defendants, for a total of $75,781 - $3,978 = $71,803, as well as an equal amount in liquidated damages. *See* 29 U.S.C. § 216(b). Accordingly, Ms. Lagasan is entitled to total restitution damages under the TVPA in the amount of ($71,803 x 2) = $143,606.

> (b)   *Ms. Lagasan is Entitled to Emotional Distress Damages in the Amount of $226,000*

Ms. Lagasan is further entitled to an award of emotional distress damages for Defendants' TVPA violations. *See Howard*, 2012 WL 3834867, at *2-3; *Gurung*, 851 F. Supp. 2d at 594-95; *Mazengo*, 2007 WL 8026882, at *7. Several courts have correctly recognized that "[l]imiting TVPA victims to the FLSA remedy would *inappropriately* afford criminals engaged in such egregious practices the benefit of the lowest-common-denominator minimum wage set for legitimate employers." *Francisco v. Susano*, 525 Fed. App'x 828, 835 (10th Cir. 2013). An additional award of emotional distress damages is necessary to "redress noneconomic harm, particularly suffering related to the squalid, restricted, and threatening work/living conditions imposed on TVPA victims." *See id.* (citing *Howard*, 2012 WL 3834867, at *3-4; *Canal v. Dann*, No. 09-03366 CW, 2010 WL 3491136, at *4 (N.D. Cal. 2010)). Defendants' subjection of Ms. Lagasan to forced labor and involuntary servitude in violation of the TVPA caused her to suffer a wide range of emotional and physical injuries: she experienced difficulty sleeping, *see* Am. Compl. ¶¶ 99, 114; she became very depressed, *id.* ¶ 114; she was unable to think clearly, *id.*; and her medical conditions worsened due to Defendants' refusal to let her obtain professional treatment, which ultimately resulted in an illness that lasted several weeks, and the need to have

seven teeth pulled shortly after she was rescued, *id.* ¶¶ 103, 105-07; *see also* Lagasan Decl. ¶¶ 21-22.   After she was rescued, Ms. Lagasan continued to battle fear and anxiety.   *Id.* ¶ 127; *see also* Jefferson Decl. ¶¶ 4-5, 10-11; Lagasan Decl. ¶¶ 17-18.   Although Ms. Lagasan is currently employed, *see* Lagasan Decl. ¶ 25, she has required extensive social services to recover from the trauma that she experienced as a result of Defendants' conduct.   Am. Compl. ¶ 128; *see also* Williams Decl. ¶¶ 6-12; Jefferson Decl. ¶¶ 3-5.

"In determining the measure of recovery for non-pecuniary harms, the court should examine the duration and intensity of the emotional distress, which in turn requires that the court consider 'all relevant circumstances . . . , including sex, age[,] condition in life and any other fact indicating susceptibility of the injured person to [the] type of harm."   *Mazengo*, 2007 WL 8026882, at *7.   The Court likewise must ensure that the emotional distress award is "'within a reasonable range'" by looking to awards made to trafficking victims in similar cases.   *Carazani*, 972 F. Supp. 2d at 24 (citing *Mazengo*, 2007 WL 8026882, at *7).   Ms. Lagasan was particularly vulnerable to mistreatment as a young woman thousands of miles away from her family, in a country where she knew no one, with meager financial resources and only limited ability to speak English.   *See* Am. Compl. ¶¶ 2, 115.   Defendants capitalized on this vulnerability: they forced Ms. Lagasan to work as many as 19 hours per day, made her sleep on the floor of a cramped closet, subjected her to verbal and psychological abuse, and kept her in total isolation from the outside world, confiscating her passport, preventing her from leaving their home by herself, and scolding her if she attempted to speak to anyone outside their presence.   *Id.*   In comparable cases, courts "have ordered or affirmed emotional distress damages relating to forced domestic labor of trafficking victims ranging from $415 to $800 for each day of forced labor."   *Howard*, 2012 WL 3834867, at *3 (awarding $500 per day in emotional distress

damages to trafficking victim who was subjected to extensive sexual abuse in addition to forced labor); *Gurung*, 851 F. Supp. 2d 583, 594 (awarding emotional distress damages in the amount of $410 per day to trafficking victim who worked for defendants for about three years, during which time "[h]er documents were seized, her travel was restricted, and she was not permitted to telephone her family"); *Carazani*, 972 F. Supp. 2d at 25 (awarding $400 per day in emotional distress damages to trafficking victim who was forced into involuntary labor, isolated from the outside world, and psychologically abused).

Accordingly, Ms. Lagasan respectfully requests that she be awarded damages for the emotional distress that she suffered as a result of Defendants' violations of the TVPA in the amount of $400 per day of her forced labor and involuntary servitude, for a total of ($400 per day) x (565 days) = $226,000.

    (c)    *Ms. Lagasan is Entitled to Punitive Damages in the Amount of $369,606*

Ms. Lagasan is further entitled to an award of punitive damages based on Defendants' violations of the TVPA. As the Ninth Circuit has explained, "[p]unitive damages are generally appropriate under the TVPA civil remedy provision because [the TVPA] creates a cause of action for tortious conduct that is ordinarily intentional and outrageous." *Ditullio*, 662 F.3d at 1098. In other words, because "the wrong done by violation of the TVPA" is one that—by definition—involves "significant violations not only of labor standards but fundamental health and personal rights as well," an award of punitive damages in a TVPA case is generally consistent with "the traditional use of punitive damages . . . to punish and deter conduct involving an element of outrage." *Francisco*, 525 Fed. App'x at 834-35. Such awards are likewise consistent "with Congress' purposes in enacting the TVPA, which include increased protection for victims of trafficking and punishment of traffickers." *Ditullio*, 662 F.3d at 1098.

In determining the proper amount of such punitive damages awards, courts examine factors such as whether the defendant acted with reckless disregard for the health and safety of the victim; whether the defendant's conduct involved repeated actions; and whether the conduct was the result of malice or deceit as opposed to mere accident.  *See Howard*, 2012 WL 3834867, at *4-5 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 437 (2003)).

In this case, Defendants acted intentionally and maliciously, and with reckless disregard for Ms. Lagasan's health and safety when they trafficked Ms. Lagasan through Qatar to the United States, with the purpose of forcing her to work excessive hours in their home for far less than the federal minimum wage.  *See, e.g.*, Am. Compl. ¶¶ 212, 216, 219, 224, 230.  Defendants held Ms. Lagasan as a virtual prisoner in their home for approximately 18 months, and absent the intervention of a concerned neighbor and the United States Government, Ms. Lagasan's ordeal may well have lasted even longer.  *See id.*  ¶¶ 116-25.

Trafficking victims who have endured experiences comparable to those of Ms. Lagasan have received punitive damage awards for their TVPA claims ranging from $300,000 to $2,000,000.  *See, e.g.*, *Canal*, 2010 WL 3491136, at *4 (finding that trafficking victim was entitled to approximately $300,000 in punitive damages—"an amount equal to her compensatory damages"—where the defendant "acted with a conscious disregard for [the plaintiff's] right to be free from involuntary servitude and . . . intentionally misrepresented facts for the purpose of depriving her of this right"); *Carazani*, 972 F. Supp. 2d at 27 (awarding punitive damages in the amount of $543,041.28 where "[t]he defendant accepted the plaintiff's services around the clock, seven days per week for nearly three years and paid her a total of $8.50"); *Howard*, 2012 WL 3834867, at *4-5 (finding a $2,000,000 punitive damages award appropriate where the plaintiff was subjected to frequent sexual abuse during her involuntary servitude).

In general, courts have found a 1:1 ratio of compensatory to punitive damages appropriate for TVPA violations.  *See Carazani*, 972 F. Supp. 2d at 27 (citing *Shukla v. Sharma*, No. 07-CV-2972 (CBA) (CLP), 2012 WL 481796, at *16 (E.D.N.Y. Feb. 14, 2012); *Canal*, 2010 WL 3491136, at *4).  Such a ratio is justified—despite the inclusion of FLSA liquidated damages in TVPA compensatory damage awards—because the FLSA "simply remedies the failure to pay wages at the statutory minimum [w]age"; by contrast, "[t]he forced labor addressed by the TVPA is a categorically different wrong, involving work extracted by victims by the illegal and coercive means specified in the statute." *Francisco*, 525 Fed. App'x at 835.

For all these reasons, Ms. Lagasan respectfully requests an award of punitive damages under the TVPA in an amount equal to her total compensatory damages: $369,606.

2.     Ms. Lagasan is Entitled to Damages for her FLSA Claim

As set forth above, Ms. Lagasan's damages under the FLSA are $143,606, plus reasonable attorneys' fees.  *See* 29 U.S.C. §§ 206(a)(1)(C), 216(b).  Because these damages are duplicative of Ms. Lagasan's damages under the TVPA, Ms. Lagasan only seeks damages under the FLSA in the event that the Court fails to award her all the damages that she seeks in connection with her claims against Defendants under the TVPA.

**B.     Ms. Lagasan is Entitled to Damages for her State Law Claims**

1.     Ms. Lagasan is Entitled to Damages for Breach of Contract

Ms. Lagasan is entitled to recover all of the wages to which she is entitled under the terms of her employment contract with Defendants, less the amount that she was actually paid. Generally, "[u]nder Pennsylvania law, '[i]n an employment case, the measure of damages is the wages which were to be paid less any amount actually earned or which might have been earned through the exercise of reasonable diligence.'" *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 146-47 (3d Cir. 2000) (quoting *Delliponti v. DeAngelis,* 681 A.2d 1261, 1265 (Pa. 1996)).  Where—

as here—a party is entitled to recovery under the FLSA, she may recover additional damages for breach of contract to the extent that she is contractually entitled to more than the amount awarded under the FLSA. *See, e.g.*, *Dutan*, 2014 WL 4701166, at *8; *Sosnowy v. A. Perri Farms, Inc.*, 764 F. Supp. 2d 457, 468-69 (E.D.N.Y. 2011) ("[T]o the extent a contract provides greater rights to overtime compensation than the FLSA, the FLSA does not preempt the contract claim."); *Hammond v. Lowe's Home Centers, Inc.*, 316 F. Supp. 2d 975, 979 (D. Kan. 2004) ("[A]n employer may establish contractual rights to overtime or other payments that exceed the FLSA's mandate . . . and an employer may be held liable for breach of contract if a plaintiff establishes a right to such a payment in a contract independent of the FLSA.").

Here, Ms. Lagasan worked 18 or 19 hours per day for Defendants for 565 days—a total of approximately (18.5 hours per day) x (565 days) = 10,453 hours. *See* Am. Compl. ¶¶ 2, 22-23, 76, 88, 123, 137. Ms. Lagasan was paid a total of only $3,978 for these hours. *See supra* § II.A.1.a. As set forth above, based on the federal minimum wage in place during the relevant timeframe ($7.25 per hour), Ms. Lagasan is entitled to $71,803 in unpaid wages under the FLSA and TVPA. *See id.* Pursuant to the terms of her employment contract, however, Ms. Lagasan was promised an additional $0.97 per hour over and above the $7.25 per hour federal minimum wage—*i.e.*, the prevailing wage in Pennsylvania, or $8.22 per hour. Am. Compl. ¶ 70; *id.*, Ex. A; *see also supra* § I.F. Thus, Ms. Lagasan should be awarded an additional ($8.22 per hour - $7.25 per hour) x (10,453 hours) = $10,139 in damages for her breach of contract claim.

2.   Ms. Lagasan is Entitled to Damages for Fraud

In an action for fraud, a plaintiff is entitled to recover her actual loss caused by the fraud. *See B&P Holdings I, LLC. v. Grand Sasso, Inc.*, 114 F. App'x 461, 466-67 (3d Cir. 2004). Actual loss may include "compensation for physical and mental suffering." *See Sites v. Nationstar Mortgage LLC*, 646 F. Supp. 2d 699, 713 (M.D. Pa. 2009). Moreover, "[i]t is well

established that, under Pennsylvania law, punitive damages may be awarded in cases of common law fraud." *Klein v. Weidner*, 729 F.3d 280, 296 (3d Cir. 2013).  Although Ms. Lagasan suffered actual loss as a result of Defendants' fraud—in the form of physical and mental anguish, and the denial of federally-mandated and contractually-bargained-for wages—these are the same injuries that Ms. Lagasan suffered as a result of Defendants' violations of the TVPA, FLSA, and breach of contract.  Thus, Ms. Lagasan only seeks damages for the actual loss caused by Defendants' fraud in the event that the Court does not grant her all of the relief she seeks with respect to her TVPA, FLSA, and breach of contract claims.  *See Dutan*, 2014 WL 4701166, at *8.

### 3.   Ms. Lagasan is Entitled to Damages for False Imprisonment

In assessing damages for a false imprisonment claim, courts consider the length of the detention, the conditions of the detention, the severity of any injuries inflicted by the defendants, the nature of the defendants' conduct, as well as the humiliation, embarrassment, and emotional distress experienced by the victim as a result of the detention.  *See, e.g.*, *Glass v. City of Philadelphia*, 455 F. Supp. 2d 302, 367-69 (E.D. Pa. 2006); *Padilla v. Miller*, 143 F. Supp. 2d 479, 494 (M.D. Pa. 2001).  Additionally, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) (internal quotation marks omitted).  Here, Ms. Lagasan was falsely imprisoned by Defendants for approximately eighteen months, during which time she was deprived of her passport; prevented from leaving Defendants' residence by herself for any reason; and denied access to necessary medical care. *See* Am. Compl. ¶¶ 82, 89, 103-06, 108, 113, 115, 119, 123.  As with Ms. Lagasan's fraud claim, however, the injuries that Ms. Lagasan sustained as a result of her false imprisonment are the same as those for which she is entitled to damages under the TVPA.  Because a party may not recover twice for the same injury, *see Dutan*, 2014 WL 4701166, at *8, Ms. Lagasan only seeks

damages for her false imprisonment claim to the extent that the Court declines to award her all of the relief that she seeks in connection with her TVPA, FLSA and breach of contract claims.

## CONCLUSION

For the foregoing reasons, Ms. Lagasan respectfully requests an order from this Court: (a) entering a default judgment against Defendants on Counts I-VIII and Count X of the First Amended Complaint; (b) entering an award of damages in the amount of $749,351, plus reasonable attorneys' fees; and (c) any other relief that this Court deems just and proper.


Dated:  December 17, 2014                    Respectfully submitted,

                                              /s/ Jason C. Schwartz
                                             Jason C. Schwartz, Va. Bar No. 43635
                                             Molly T. Senger, *Admitted Pro Hac Vice*
                                             Anna M. McKenzie, Va. Bar No. 84022
                                             jschwartz@gibsondunn.com
                                             msenger@gibsondunn.com
                                             amckenzie@gibsondunn.com
                                             Gibson, Dunn & Crutcher LLP
                                             1050 Connecticut Avenue, N.W.
                                             Washington, DC  20036
                                             Telephone: 202.955.8500
                                             Facsimile:  202.467.0539

                                             Caeli A. Higney, *Admitted Pro Hac Vice*
                                             chigney@gibsondunn.com
                                             Gibson, Dunn & Crutcher LLP
                                             555 Mission Street
                                             San Francisco, CA 94105-2933
                                             Telephone: 415.393.8200
                                             Facsimile:  415.393.8306

                                             *Attorneys for Plaintiff Armiya Bani Lagasan*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of December, 2014, I deposited in the U.S. mail a true and correct copy of the above in a sealed envelope, with first class postage prepaid, to the addressees shown below:

> Hadban and Jimla Al-Ghasel
> 100 South Reynolds Street
> Unit # 603
> Alexandria, VA 22304

  /s/ Jason C. Schwartz
Jason C. Schwartz
GIBSON, DUNN & CRUTCHER
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
jschwartz@gibsondunn.com
