UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ARMIYA BANI LAGASAN,            )
    Plaintiff,              )
                            )
        v.                  )   Civil Action No. 1:14cv1035
                            )
HADBAN AL-GHASEL, et al.,       )
    Defendants.             )

REPORT AND RECOMMENDATION

This matter comes before the Court on Motion for Default
Judgment by plaintiff Armiya Bani Lagasan ("plaintiff") against
defendants Hadban Al-Ghasel and Jimla Al-Ghasel, also known as
Zamia Mohd, also known as Zamla Mohd ("defendants").  (Dkt. 13.)
After a representative for defendants failed to respond to
plaintiff's Motion or to appear at the hearing on January 9,
2015, the undersigned Magistrate Judge took this matter under
advisement.[1]

INTRODUCTION

**I. Background**

Plaintiff is a 27-year-old Filipino woman who was
trafficked through Qatar into the United States and forced to
work excessive hours in abominable working and living conditions

---

[1] The record before the Court includes the First Amended Complaint
("Compl") (Dkt. 7), plaintiff's Motion for Default Judgment ("Mot.
Default J.") (Dkt. 13), the Memorandum in Support of the Motion for
Default Judgment ("Mem. Supp. Mot. Default J.")(Dkt. 14), the
Declaration of Armiya Lagasan ("Lagasan Aff.")(Dkt. 14-2), and all
attachments and exhibits submitted with those filings.

for meager wages by defendants Hadban Al-Ghasel ("defendant Mr.
Al-Ghasel") and Jimla Al-Ghasel, also known as Zamia Mohd, also
known as Zamla Mohd ("defendant Mrs. Al-Ghasel"). (Compl. ¶¶ 1-
2.)  Plaintiff had previously lived in the Philippines with her
husband, daughter and other family members, and decided to
travel abroad to work as a domestic servant so she could send
money home to her family. (Id. at ¶¶ 27-32.)  Plaintiff was
recruited by an individual in the Philippines and a recruiting
agency, which arranged for her to travel to Qatar and work as a
domestic servant. (Id. at ¶¶ 33-48.)  The representative for
the recruiting agency gave plaintiff a receipt indicating that
her salary in Qatar would be $400 USD per month. (Id. at ¶ 47.)
Plaintiff worked from September 28, 2010 to February 12, 2011,
in Qatar for members of defendants' families. (Id. at ¶¶ 53-
74.)

     Plaintiff was then sent to the United States in February
2011 to work for defendants in Pittsburgh, Pennsylvania. (Id.
at ¶¶ 76, 86.)  Defendants confiscated plaintiff's passport and
visa upon her arrival in the United States. (Id. at ¶ 82.)
From January 12, 2011 until August 30, 2012, defendants forced
plaintiff to work at least 18 hours a day, seven days a week,
for as little as $200 per month. (Id. at ¶ 2.)  They prohibited
her from leaving the house, from communicating with anyone
outside their presence, and denied her access to medical care,

2

while subjecting her to verbal abuse and inhumane living conditions.  (Id.)  Plaintiff was rescued by ICE agents from the defendants' home on August 30, 2012.  (Id. at ¶ 6.)

Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPA"), 18 U.S.C. §§ 1589 and 1590, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and Virginia state law.  (Id. at ¶ 10.)

## II. Jurisdiction and Venue

Rule 55 of the Federal Rules of Civil Procedure provides for the entry of default judgment when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend."  The court must have both subject matter and personal jurisdiction over a defaulting party before it can render default judgment.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because plaintiff's allegations concern the TVPA, 18 U.S.C. §§ 1589 and 1590, and the FLSA, 29 U.S.C. § 201, et seq.  This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy and share a common nucleus of operative fact with her federal law claims.  Therefore, federal question subject matter jurisdiction exists.

This Court has personal jurisdiction over defendants because they purposefully availed themselves of the privilege of

3

conducting activities in the Commonwealth of Virginia. (Compl. ¶ 17.) Specifically, defendants employed plaintiff to work as a domestic servant within this district from September 2011 through August 2012. (Id. at ¶ 23.) Therefore, personal jurisdiction is proper.

Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, and pursuant to 28 U.S.C. § 1391(b)(1) because defendants are residents of the state in which this District is located. (Id. at ¶¶ 23-25.)

### III. Service of Process

On October 17, 2014, plaintiff's private process server served defendant Mrs. Al-Ghasel. (Dkt. 9.) He also left process with Mrs. Al-Ghasel at defendants' residence for Mr. Al-Ghasel. (Dkt. 10.) Therefore, service was proper under 29 U.S.C. § 1132(e)(2), which provides that process may be served in any district where a defendant resides or may be found.

### IV. Grounds for Default Judgment

Plaintiff filed this action on August 13, 2014. (Dkt. 1.) Defendant has not appeared, answered, or otherwise filed any responsive pleadings in this case. On November 13, 2014, the Clerk of this Court entered default pursuant to plaintiff's Request for Entry of Default and Federal Rule of Civil Procedure 55. (Dkt. 12.) Plaintiff filed her Motion for Default Judgment

(Dkt. 13) and a Memorandum in Support of Motion for Default Judgment (Dkt. 14) on December 17, 2014.  After defendants failed to appear at the hearing on plaintiff's Motion for Default Judgment on January 9, 2015, the undersigned took this matter under advisement.  (Dkt. 17.)

FINDINGS OF FACT

Upon a full review of the pleadings, the undersigned Magistrate Judge finds that plaintiff established the following facts.

Plaintiff is a citizen of the Republic of the Philippines currently residing in Washington, D.C., and defendants, husband and wife, are citizens of Qatar currently residing in Alexandria, Virginia.  (Compl. ¶¶ 21-25.)  At the time of the events giving rise to this action, defendants lived in Harrisburg, Pennsylvania, and then Alexandria, Virginia.  (Id. at ¶¶ 22-23.)

In June 2010, plaintiff met a woman named Nuriya who offered to help plaintiff find work as a domestic servant overseas.  (Compl. ¶ 33.)  Nuriya was a recruiter for Golden Future, a recruiting agency in the Philippines, and worked with Golden Future to obtain plaintiff obtain a passport.  (Id. at ¶¶ 35-37.)  Nuriya brought plaintiff to Cotabato City to pick up plaintiff's passport and sent that passport to Golden Future in Manila.  (Id. at ¶ 39.)  On August 27, 2010, plaintiff traveled

5

to Manila to attend a three-week orientation program at Golden
Future. (Id. at ¶ 40.)  At the Golden Future training,
plaintiff was informed that even if she decided not to undertake
employment overseas, she would be required to pay Nuriya and
Golden Future an amount equivalent to four months' salary. (Id.
at ¶ 43.)  On September 23, 2010, a Golden Future representative
brought plaintiff to the airport and gave plaintiff her
passport, a plane ticket to the United Arab Emirates, and a
receipt signed by the Philippine Department of Labor and
Employment which indicated that her salary in Qatar was to be
$400 USD per month. (Id. at ¶¶ 45-47.)

Upon her arrival at the airport in Doha, Qatar, plaintiff's
passport and cellphone were taken from her by representatives
from Gulf Spring Manpower, Golden Future's sister agency. (Id.
at ¶¶ 49-50.)  Plaintiff was informed that her salary would be
only 730 Qatar Riyals per month, about $200 USD. (Id. at ¶ 51.)
On September 28, 2010, Mrs. Al-Ghasel's sister, Baniya, picked
plaintiff up from agency. (Id. at ¶ 53.)  Plaintiff worked for
Baniya for one week, and was then brought to Umm Bab, a desert
town, to work for Mrs. Al-Ghasel's mother. (Id. at ¶¶ 54-55.)
Plaintiff was forced to work eighteen or nineteen hours a day
without any days off, cleaning Mrs. Al-Ghasel's mother's tent,
cooking meals, and washing Mrs. Al-Ghasel's mother's hair and
legs. (Id. at ¶¶ 56-58.)  Throughout this period, plaintiff was

6

forced to sleep outdoors on a mattress on the sand; when she awoke, she could see trails in the sand around her mattress left by snakes. (Id. at ¶ 59.) Plaintiff was not permitted to speak with other domestic servants she encountered, was not allowed to sit down during the work day, and at one point in time, was physically forced into a goat pen while threatened by Mrs. Al-Ghasel's mother. (Id. at ¶¶ 61-63.)

In December 2010, plaintiff was taken from Umm Bab back to Doha where she worked for Mrs. Al-Ghasel's sister, Baniya. (Id. at ¶ 65.) In Doha, plaintiff performed domestic labor from 4:00am until 11:00pm or 12:00am every day. (Id. at ¶ 66.) At some point in January 2011, plaintiff was informed she would be going to the United States to work for defendants. (Id. at ¶ 67.) Mr. Al-Ghasel's brother presented plaintiff with an employment contract, which she signed, that identified defendant Mr. Al-Ghasel as the employer. (Id. at ¶¶ 68-69.) Under the terms of the agreement, plaintiff was guaranteed the "prevailing wages of Pennsylvania per hour", that she would work only eight hours a day, for a maximum of forty hours per week, with two days off per week, and that she would retain possession of her passport. (Id. at ¶ 70.) At the U.S. Embassy in Qatar, plaintiff told a consular officer that she understood the contract, and Mr. Al-Ghasel's brother gave plaintiff's passport to the Embassy officer. (Id. at ¶ 72.) On February 11, 2011,

7

another sister of Mrs. Al-Ghasel threatened plaintiff, telling
her that when she arrived in the United States, she had better
wait at the airport for Mr. Al-Ghasel "or else." (Id. at ¶ 73.)
On February 12, 2011, defendants trafficked plaintiff from Qatar
to the United States, and seized her passport shortly after her
arrival in Harrisburg, Pennsylvania. (Id. at ¶¶ 76, 81-82.)

Plaintiff lived and worked for defendants in Pittsburgh,
Pennsylvania from approximately February 2011 until September
2011. (Id. at ¶ 86.) She was paid $201 USD per month during
this period of time. (Id.) On September 26, 2011, plaintiff
moved with defendants to Alexandria, Virginia where she received
a pay raise to $220 per month. (Id. at ¶ 87.) While working
for defendants, plaintiff worked in their home from 5:00am until
11:00pm or 12:00am, seven days a week, without days off. (Id.
at ¶ 88.) Her duties included cleaning the apartment, cooking
for the defendants and their guests, laundering the Al-Ghasel's
clothes, and caring for the defendants' children. (Id. at ¶¶
89-91.) Plaintiff was not permitted to take any breaks during
her work day; if she tried sitting down, she would be yelled at
by defendants and given menial tasks to fill her time. (Id. at
¶ 95.) Defendants forced plaintiff to sleep on the floor of a
small bedroom used for storage in Pittsburgh, and on the floor
of a closet in Alexandria. (Id. at ¶¶ 98-99.) She was not
permitted to have leisure activities, was forced to wear a

8

restricted wardrobe, and was denied access to medical and dental care. (Id. at ¶¶ 100-106.) Furthermore, defendants isolated plaintiff and confined her to their home by restricting her movements, confiscating her travel documents, and not allowing her to communicate with anyone from the outside world. (Id. at ¶¶ 108-12.) Plaintiff wanted to return home to the Philippines but stayed with defendants because she had nowhere else to go; she spoke limited English, had little money, and was unfamiliar with the area surrounding the apartment. (Id. at ¶ 115.)

Plaintiff began to meet some neighbors while carrying out her daily duties, including meeting Collette Price, a tutor for defendants' children. (Id. at ¶¶ 116-117.) Ms. Price observed plaintiff's poor working conditions and after conversations with plaintiff, contacted the National Human Trafficking Resource Center ("NHTRC"). (Id. at ¶¶ 118-121.) The NHTRC contacted ICE who interviewed Ms. Price. (Id. at ¶ 121.) On August 30, 2012, ICE agents went to defendants' apartment to investigate. (Id. at ¶ 123.) Plaintiff left defendants' home with the ICE agents that day. (Id. at ¶¶ 124-125.)

Plaintiff alleges 11 counts in her complaint: (1) forced labor in violation of the TVPA, 18 U.S.C. §§ 1589(a), 1595; (2) involuntary servitude in violation of TVPA, 18 U.S.C. §§ 1584, 1595; (3) trafficking with respect to peonage, slavery, involuntary servitude, or forced labor in violation of the TVPA,

18 U.S.C. §§ 1590, 1595; (4) unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor in violation of the TVPA, 18 U.S.C. §§ 1592, 1595; (5) benefiting financially from trafficking in persons in violation of the TVPA, 18 U.S.C. §§ 1593A, 1595; (6) conspiracy to violate TVPA, 18 U.S.C. §§ 1589, 1590, 1595, 1594, 1595; (7) failure to pay the federal minimum wage in violation of the FLSA, 29 U.S.C. §§ 206, 216; (8) breach of contract; (9) unjust enrichment/quantum meruit; (10) fraud; and (11) false imprisonment.  Plaintiff brings all claims against both defendants.

EVALUATION OF PLAINTIFF'S COMPLAINT

Where a defendant has defaulted, the facts set forth in the plaintiff's complaint are deemed admitted.  Before entering default judgment, however, the Court must evaluate the plaintiff's complaint to ensure that the complaint properly states a claim.  GlobalSantaFe Corp. v. Globalsantafe.com, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003).  As such, it is appropriate to evaluate plaintiff's claim against the standards of Fed. R. Civ. P. 12(b)(6).

**A.   Counts 1 Through 6: Trafficking Victims Protection Act**

Plaintiff's Complaint alleges facts sufficient to demonstrate defendants' liability under all six counts brought pursuant to the TVPRA, 18 U.S.C. §§ 1581, *et seq*.  Each is

addressed in turn.

First, plaintiff properly alleges a forced labor claim under subsection (a) of 18 U.S.C. § 1589.  A defendant is liable under subsection (a) when he or she "knowingly provides or obtains the labor or service of a person" through the following:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person[2];
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).

Here, plaintiff's Complaint provides ample facts to show that defendants are liable under subsection (a) of 18 U.S.C. § 1589.  In particular, defendants' actions included confiscating travel documents (Compl. ¶¶ 49, 72, 74, 82, 115, 123); presenting fraudulent documents to obtain plaintiff's U.S. visa (Id. at ¶¶ 68-72); having family members physically threaten plaintiff (Id. at ¶¶ 63, 73); prohibiting plaintiff from obtaining necessary medical services (Id. at ¶¶ 103-106);

---

[2] See 18 U.S.C. § 1589(c)(2) (defining "serious harm" to include "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm").

confining her to defendants' residence (Id. at ¶¶ 89, 108-11); financially threatening her (Id. at ¶ 96); berating her for speaking with anyone outside defendants' family (Id. at ¶¶ 83, 108-113); and ignoring plaintiff's requests to return to the Philippines (Id. at ¶ 115).  Therefore, plaintiff sufficiently shows defendants' liability under 18 U.S.C. § 1589(a).

Second, plaintiff demonstrates that defendants are liable under Count 3, violation of 18 U.S.C. § 1590.  This section of the TVPRA imposes separate liability for one who "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter."  Id.; Shukla v. Sharma, No. 07-cv-2972, 2012 WL 481796, at *14 (E.D.N.Y. Feb. 14, 2012) (determining that liability for trafficking is separate from liability for forced labor or involuntary servitude).  This claim generally requires some conduct that occurs abroad.  See Tanedo v. E. Baton Rouge Parish Sch. Bd., No. CV10-1172, 2012 WL 5378742, at *7 (C.D. Cal. Aug. 27, 2012).

Here, defendants are liable under 18. U.S.C. § 1590 because they knowingly recruited plaintiff's services through an employment agency in the Philippines, brought her to Qatar, and arranged to transport her to the United States by fraudulently acquiring a visa for the purpose of forced labor or involuntary servitude.  (Compl. ¶¶ 33-40, 49-51, 67-74.)  Therefore,

12

plaintiff's Complaint sufficiently demonstrates defendants' liability pursuant to 18 U.S.C. § 1590.

Third, plaintiff properly alleges a claim under Count 4, unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor in violation of the TVPRA, 18 U.S.C. § 1592(a).[3] Defendants confiscated, possessed, and concealed plaintiff's passport and identification documents upon her arrival in Qatar, and only briefly allowed her to use those documents to gain entry into the U.S. (Compl. ¶¶ 49, 68-72, 74, 82, 115.) This conduct occurred in the course of committing forced labor and

---

[3] This portion of the TVPRA, 18 U.S.C.A. § 1592(a), states:

(a) Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person—

(1) in the course of a violation of section 1581, 1583, 1584, 1589, 1590, 1591, or 1594(a);

(2) with intent to violate section 1581, 1583, 1584, 1589, 1590, or 1591; or

(3) to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000, shall be fined under this title or imprisoned for not more than 5 years, or both.

involuntary servitude violations, and was done with the
intention of preventing or restricting plaintiff's ability to
leave defendants' residences.  (Id.)  Therefore, Count 4 is
properly alleged.

Fourth, plaintiff alleges Count 2, involuntary servitude in
violation of the TVPRA, 18 U.S.C. § 1584, in the alternative to
her forced labor claim (Count 1).  This portion of the statute
allows plaintiff to hold liable a defendant who "knowingly and
willfully holds to involuntary servitude" any person.  18 U.S.C.
§ 1584(a).  Plaintiff's Complaint shows that defendants
knowingly and willfully lured plaintiff to the U.S. through
Qatar for the purposes of holding her to involuntary servitude,
and intended to cause plaintiff to believe that she would suffer
serious harm, physical restraint, or the abuse of legal process
if she refused to work.  (Compl.  ¶¶ 2-3, 49-50, 68-70, 73, 82,
95-97, 115.)  Therefore, plaintiff properly alleges Count 2.

Fifth, plaintiff pleads Count 5, benefiting financially
from trafficking in persons in violation of the TVPRA, 18 U.S.C.
§ 1593A, in the alternative to her forced labor claim (Count 1).
This portion of the TVPRA states that

> Whoever knowingly benefits, financially or by
> receiving anything of value, from participation in a
> venture which has engaged in any act in violation of
> section 1581(a), 1592, or 1595(a), knowing or in
> reckless disregard of the fact that the venture has
> engaged in such violation, shall be fined under this

14

title or imprisoned in the same manner as a completed
violation of such section.

18 U.S.C.A. § 1593A.   Plaintiff shows that defendants knowingly

benefited from their participation in the trafficking venture

that violated the TVPRA by receiving plaintiff's labor for

meager wages.   (Compl. ¶¶ 2, 86-87, 97.)   Defendants' knowledge

is evidenced by the fact that they entered into an employment

contact which promised her the "prevailing wages of

Pennsylvania" for her services but then refused to honor the

terms of that contract.   (Id. at ¶¶ 70, 97.)   Defendants'

actions therefore violated 18 U.S.C. § 1593A.

Finally, plaintiff sufficiently states a conspiracy claim

pursuant to 18 U.S.C. § 1594(b).   Under this provision,

"whoever conspires with another to violate section 1581, 1583,

1589, 1590, or 1592 shall be punished in the same manner as a

completed violation of such section."   18 U.S.C. § 1594(b).   The

facts show that defendant Mr. Al-Ghasel conspired with defendant

Mrs. Al-Ghasel, as well as Golden Future, Nuriya, Mr. Al-

Ghasel's Brother, Mrs. Al-Ghasel's sister, and Mrs. Al-Ghasel's

mother, to violate the TVPRA by agreeing to obtain plaintiff's

services for the purpose of forced labor, involuntary servitude,

and trafficking.   See supra 11-15.   Defendants, as members of

this conspiracy, are thus liable under this TVPA provision.

15

**B.    Count 7: Fair Labor Standards Act**

Plaintiff's Complaint properly alleges a claim under the FLSA, 29 U.S.C. §§ 201, *et seq.*  The FLSA mandates that employees, including individuals serving as domestic workers in a household, be paid a minimum wage of at least $7.25 per hour for all hours worked.[4]  29 U.S.C. §§ 206 & 216(b).  To establish a violation of the FLSA for non-payment of minimum wage under 29 U.S.C. § 206, a plaintiff must show that: (1) plaintiff was employed by the defendant; (2) plaintiff was engaged in commerce or in the production of goods for commerce; (3) plaintiff was not compensated for all hours worked during each work week at a rate equal to or greater than the applicable minimum wage; and, (4) none of the exemptions in 29 U.S.C. § 213 apply to plaintiff's position.  29 U.S.C. § 206.

Here, plaintiff's Complaint satisfies all elements of this claim.  The FLSA specifically recognizes domestic service work, such as that performed by plaintiff, as covered by the statute.  29 U.S.C. § 206(f).  Defendants were employers under 29 U.S.C. § 203(d) and plaintiff qualified as an employee under 29 U.S.C. § 203(e) because defendants hired plaintiff to work in their private residences on the promise of an exchange of payment in

---

[4] Plaintiff is not entitled to overtime pay under the FLSA because the maximum hour requirements exclude a domestic service employee who resides in the household where she is employed.  29 U.S.C. § 207(b)(21).

return for her services.   (Compl. ¶¶ 68-70.)   Defendants paid

plaintiff between $201 and $220 per month for her work from

February 12, 2011 to August 30, 2012.   (Id. at ¶¶ 86-87.)

Throughout this time, plaintiff worked approximately 18-19 hours

per day, with no days off.[5]   (Id. at ¶¶ 2, 88, 91.)   Plaintiff

worked a total of approximately 10,453 hours and was paid a

total of only $3,978 for these hours.   (Mem. Supp. Mot. Default

J. 27.)   This amount equaled roughly $0.40 per hour—well below

the minimum wage rate of $7.25 per hour.   As explained in

previous sections, defendants' failure to pay was knowing and

willful, and no evidence has been produced to show that any of

the exemptions listed in 29 U.S.C. § 213 apply to plaintiff.

Therefore, plaintiff is a covered employee under the FLSA and

entitled to recover lost wages.

## C.   Counts 8, 9, 10, 11: Virginia State Law Claims

Plaintiff's Complaint also alleges four counts under

Virginia state law.   She seeks additional damages under Count 8,

a breach of contract claim.   Plaintiff does not specifically

---

[5] An employee's total hours worked can be established by a
reasonable estimate of hours worked and compensation received.
See Osias v. Marc, 700 F. Supp. 842, 844 (D. Md. 1998) (finding
that employees' anecdotal and imprecise evidence was "reasonably
accurate enough to substantiate" the hours worked); Lopez v.
Lawns 'R' Us, Civ. No. DKC 07-2979, 2008 WL 2227353, at *3 (D.
Md. May 23, 2008) ("An employee's testimony as to his
recollection of the hours he worked and the pay he received, if
considered credible by the trier of fact, is sufficient to
establish a prima facie case of wages owed.").

seek damages under claims 9-11, as her injures under the state law claims arise out of the same conduct and actions as her TVPRA and FLSA claims. (Mem. Supp. Mot. Default J. 27-29.) Nonetheless, her Complaint sets forth sufficient facts to demonstrate defendants' liability on these counts.[6]

Plaintiff properly alleges Count 8, a breach of contract claim, in alternative to her FLSA claim and for additional damages. (Mem. Supp. Mot. Default J. 14-16, 26-27.) Plaintiff shows that, pursuant to the parties' U.S. contract, defendants owed her the prevailing wage in Pennsylvania, $8.22 per hour. (Id. at 16, 27; Compl. ¶ 70, Ex. A; McKenzie Decl. (Dkt. 16) Ex. 1.) Defendants breached this legally enforceable obligation by failing to honor the terms of the contract when they paid plaintiff approximately $0.40 per hour, forcing her to work more hours than permitted under the agreement, refusing to provide plaintiff with any days off, and restricting her freedom of movement, thereby causing plaintiff damages. (Mem. Supp. Mot. Default J. 16, 27; Compl. ¶¶ 115, 199, 201.)

Plaintiff states facts sufficient to establish defendants' liability under Count 10, fraud. Her Complaint shows that defendants intentionally and knowingly made false

---

[6] Plaintiff's Motion for Default Judgment only requests that default be entered on Counts 1-8 (TVPA, FLSA, and Breach of Contract Claims) and Count 10 (Fraud), and also provides argument for Count 11 (False Imprisonment). This Report and Recommendation will therefore not address plaintiff's Quantum Meruit claim.

representations of material fact about the conditions of her employment so as to mislead her to come the United States on the empty promise of high wages. (Mem. Supp. Mot. Default J. 17; Compl. ¶¶ 51, 70, 213.) Plaintiff reasonably relied on those misrepresentations, and suffered damages by being forced to work for meager pay under terrible conditions. (Compl. ¶¶ 2, 216-217.) See Evaluation Research Corp. v. Alequin, 439 S.E.2d 387, 390 (Va. 1994) (damages for fraud based on the "resulting damage to the party mislead"). This Count is properly pled.

Finally, Count 11, false imprisonment, is properly alleged by plaintiff in the alternative to her forced labor and involuntary servitude claims. (Mem. Supp. Mot. Default J. 28-29.) Plaintiff demonstrated that defendants intentionally restricted her freedom, movement, and physical liberty without legal right by confining her to first their Pennsylvania residence, and then their Virginia residence. (Id.; Compl. ¶¶ 82, 108-109, 115.) Defendants accomplished this restraint through the use of words and acts, including confiscating her identification documents and denying her access to anyone who could help her out of the situation. (Id.)

REQUESTED RELIEF

Plaintiff moves for compensatory damages, punitive damages, and reasonable attorneys' fees for the claims asserted in her Complaint. She seeks $369,606 in compensatory damages under her

federal claims, constituting (1) restitution damages of
$143,606.00 as compensation for the value of her services as
guaranteed under the FLSA, and (2) emotional distress damages of
$226,000.00 for defendants' multiple TVPA violations.  (Mem.
Supp. Mot. Default J. 19-21.)  Plaintiff also seeks $369,606 in
punitive damages.  (Id. at 24.)  Under her breach of contract
claim, plaintiff also moves for an additional $10,139 in
compensatory damages which would compensate her for the
additional money she is owed above the federal minimum wage.
(Id. at 27.)  At this time, plaintiff does not move for damages
on her state law claims, as they would be duplicative of the
TVPRA claims, or for a specified amount of attorneys' fees.[7]
(Id. at 25.)

### I.   Compensatory Damages: Restitution

Plaintiff moves for $143,606 in compensatory damages under
her TVPA claims, which includes $71,803 in unpaid minimum wages
and $71,803 in liquidated damages.  (Mem. Supp. Mot. Default J.
21-22.)  Restitution for a trafficking victim requires, at a
minimum, compensation for the value of her services as
guaranteed under the FLSA.  18 U.S.C. § 1593(b)(3).  The FLSA

---

[7] Plaintiff's attorneys' fees are recoverable under both the
TVPRA and FLSA.  18 U.S.C. § 1595 & 29 U.S.C. § 216(b).
However, as plaintiff does not now move for a specific amount of
attorneys' fees, the Court will withhold judgment based on this
relief.  Plaintiff may later move for a monetary award based on
those claims if so desired.

provides that "[a]ny employer who violates [the Act] shall be
liable to the employee or employees affected in the amount of
their unpaid minimum wages, or their unpaid overpaid
compensation, as the case may be, and in an additional equal
amount as liquidated damages." 29 U.S.C. § 216(b). Defendants
are therefore liable to plaintiff for her unpaid minimum wages
at the current rate of $7.25 per hour plus an equal amount of
liquidated damages.

Plaintiff provided domestic services for defendants from
February 12, 2011 until August 30, 2012 for approximately 18.5
hours a day. (Compl. ¶¶ 2, 88, 137, 99; Mem. Supp. Mot.
Default J. 21.) For these 565 days of work, defendants paid
plaintiff $3,978. (Lagasan Aff. ¶¶ 6-13, Ex. 2.) Therefore,
plaintiff is entitled to her unpaid minimum wages of $75,781
($7.25 per hour for 18.5 hours per day for 565 days), less the
$3,978 paid to her, for a total amount of $71,803. Plaintiff is
further entitled to an equal amount of liquidated damages.
Therefore, the undersigned finds that plaintiff is entitled to
restitution damages under the TVPA in the total amount of
$71,803.

## II. Compensatory Damages: Emotional Distress

Plaintiff seeks $400 per day for the severe emotional
distress caused by defendants' forced labor or involuntary
servitude and trafficking violations. (Mem. Supp. Mot. Def. J.

22-24.)  The TVPA permits a plaintiff to recover emotional distress awards for different TVPA violations.  See Shukla, 2012 WL 481796, at *14 (awarding separate damages for the forced labor and trafficking).  In determining such damages, courts look to "all relevant circumstances . . ., including sex, age, condition in life and any other fact indicating susceptibility of the injured person to [the] type of harm."  Mazengo v. Mzengi, No. 07-756, 2007 WL 8026882, at *7 (D.D.C. Dec. 20, 2007).  Plaintiffs have been awarded damages for emotional distress from trafficking subject to forced labor ranging from $410 to $780 per day.  See, e.g., Doe v. Howard, No. 1:11-cv-1105, 2012 WL 3834867, at *3-4 (E.D. Va. Sept. 4, 2012) (awarding $500 per day for three months' forced labor); Gurung v. Malhotra, No. 10-cv-5086 (S.D.N.Y. Mar. 16, 2014) (awarding $410 per day for 40 months' forced labor); Shukla, 2012 WL 481796, at *8-9 (awarding $780 per day for three and a half years' forced labor).

Here, the relevant circumstances concerning plaintiff's sex, age, condition in life, and susceptibility to harm justify plaintiff's request of damages of $400 per day.  Defendants' behavior included, but was not limited to, causing plaintiff's fear (Compl. ¶¶ 73, 85, 96-97, 115); confining her to defendants' homes (Id. at ¶¶ 89, 108, 115,); subjecting her to grueling work days (Id. at ¶¶ 88-89, 91-92, 97,); yelling at her

22

if she was caught not working (Id. at ¶¶ 95-97); denying her access to health care (Id. at ¶¶ 103-107); limiting her communication with family members and others (Id. at ¶¶ 108, 111, 112-113, ); and confining her for 565 days in the United States (Id. at ¶ 115).  Plaintiff continued to battle fear and anxiety following her rescue and required extensive social services to recover from the trauma caused by defendants. (Williams Decl. (Dkt. 14-1) 2-3, Ex. 1.)  Considering this egregious conduct and plaintiff's understandable severe emotional distress, the undersigned finds that plaintiff's request of $400 per day for emotional distress, or $226,000 in total, is appropriate.

### III.    Punitive Damages

Plaintiff requests $369,606 (an amount equal to her total compensatory damages) under the TVPA.  Punitive damages are warranted "when the defendant is found liable for conduct involving some element of outrage similar to that usually found in crime."  Ditullio v. Boehm, 662 F.3d 1091, 1097 (9th Cir. 2011).  Punitive damages should be based on the "degree of reprehensibility of the defendant's conduct" and "reflect the enormity" of the offense.  Doe, 2012 WL 3834867, at *4-5.  The factors to be considered are whether the harm was physical or economic, whether defendants acted with reckless disregard of the victim's health and safety, whether the conduct was

repeated, and whether the conduct was a result of malice or deceit as opposed to mere accident. Id. at *4-5 (citing State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 437 (2003)).

Courts routinely hold that trafficking in violation of the TVPRA is a particularly depraved act that warrants punitive damages. Id.; see also Tanedo v. E. Baton Rouge Parish Sch. Bd., 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011) (noting "the TVPA not only protects victims from the most heinous trafficking crimes, but also various additional types of fraud and extortion leading to forced labor"); Gurung, No. 10-CV-5086 (awarding $300,000 in punitive damages for a victim forced to work as a maid 16 hours per day, seven days per week for 40 months).

Here, as detailed supra, defendants acted intentionally and maliciously with reckless disregard for plaintiff's health when they trafficked her and forced her to work in terrible conditions for minimal pay, while denying her access to medical care. Defendants' repeated and intentional violations of the laws of the United States are sufficient justification to award plaintiff $369,606 in punitive damages.

## IV.    Unpaid Wages

In addition to damages under her TVPA claims, plaintiff seeks additional damages under her breach of contract claim. Parties may not recover twice for one injury. Gen. Tel. Co. of the Nw., Inc. v. Equal Employment Opportunity Comm'n, 446 U.S.

24

318, 333 (190).  Therefore, where a party is entitled to recovery under the FLSA, she may only recover additional damages for breach of contract to the extent that she is contractually entitled to more than the amount awarded under the FLSA.  See e.g. Dutan v. Sheet Metal Remodeling, LLC, 2014 WL 4701166, *8 (E.D. Va. 2014).

Here, plaintiff's employment contract stated that she would be paid the prevailing wage in Pennsylvania for her work.  For a domestic worker, that amount is $8.22 an hour in Pennsylvania (McKenzie Decl. (Dkt. 16) Ex. 1).  Thus, under the terms of the contract, plaintiff was owed $8.22 an hour for her hours worked, or $0.97 per hour over the $7.25 federal minimum wage.  Therefore, plaintiff is owed an additional $10,319 in damages for her breach of contract claim ($0.97 per hour multiplied by the 10,453 hours she worked for defendants).

### RECOMMENDATION

For the reasons outlined above, the undersigned recommends that default judgment be entered in favor of plaintiff Armiya Bani Lagasan against defendants Habdan Al-Ghasel and Jimla Al-Ghasel, jointly and severally, in the principal amount of $749,351, consisting of $369,606 in compensatory damages under the TVPA, $369,606 in punitive damages under the TVPA, and an additional $10,319 in damages for breach of contract.

<u>NOTICE</u>

The parties are advised that objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of its service.  Failure to object to this Report and Recommendation waives appellate review of any judgment based on it.

The Clerk is directed to send a copy of this Report and Recommendation to all counsel of record and to defendants at the following address:

> Jimla Al-Ghasel a/k/a Zamia Mohd a/k/a Zamla Mohd
> 100 South Reynolds Street, #603
> Alexandria, VA 22304
>
> Habdan Al-Ghasel
> 100 South Reynolds Street, #603
> Alexandria, VA 22304

_____/s/_____
THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

February <u>18th_</u>, 2015
Alexandria, Virginia